**S–1 and S–2, By and Through their parents and Guardians Ad Litem, P–1 and P–2; P–1 and P–2, Individually, Plaintiffs–Appellees,**

v.

**The STATE BOARD OF EDUCATION OF NORTH CAROLINA; Barbara Tapscott, Chairman, State Board of Education of North Carolina, Defendants–Appellants,**

and

**C.D. Heidgerd, Hearing Officer, Asheboro City Board of Education; the Asheboro City Board of Education; Mary Smitherman, Defendants.**

No. 92–1525.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1992.

Decided Sept. 21, 1993.

Rehearing En Banc Granted, Opinion Vacated Oct. 21, 1993.

Edwin Marion Speas, Jr., Sr. Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, argued, (Lacy H. Thornburg, Atty. Gen. of North Carolina, on brief), for defendants-appellants.

A. Frank Johns, Jr., Booth, Harrington, Johns & Campbell, Greensboro, NC, argued, for plaintiffs-appellees.

Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.

**OPINION**

PHILLIPS, Circuit Judge:

The essential issue presented is whether following dismissal of an action under 42 U.S.C. § 1983 for prudential reasons as moot, the § 1983 plaintiffs may yet be found prevailing parties by virtue of post-dismissal events and therefore entitled to an award of attorney fees under 42 U.S.C. § 1988. In this appeal by the State of North Carolina from such an award, we find no error and affirm.

I

When this action began, S1 and S2 were handicapped children enrolled in the Asheboro, North Carolina city schools. In the fall of 1983, after notifying the principal at the children's public school of their intentions, their parents enrolled them at their own expense in a private school for one-half of each school day to receive special education services.

The following school year, the parents demanded that the Asheboro City Board of Education (City Board) provide the children with an individualized education program comparable to that provided at the children's private school or, alternatively, provide transportation and tuition for the children to continue at the private school for the 1984–85 school year. The parents premised their demand on the Education of Handicapped Act (EHA), which the parents claimed the City Board was violating by failing to provide their children with the "free appropriate public education" guaranteed by the Act, 20 U.S.C. § 1412(1). The parents also demanded tuition reimbursement for the 1983–84 school year, claiming that the city schools failed to notify them during that school year of their federal right to receive free special education services as required by the EHA.

The City Board eventually placed the children appropriately in the city school system, but the City Board refused the parents' tuition reimbursement claim for the 1983–84 school year and for the period during the fall of 1984 before the City Board and parents negotiated a placement. When the City

Board denied their tuition reimbursement claim, the parents demanded a "due process hearing" pursuant to N.C.Gen.Stat. § 115c-116, a statute enacted pursuant to the EHA, 20 U.S.C. § 1415(b)(2). The appointed hearing officer, however, declared that he lacked authority to award tuition reimbursement, or make findings of fact attendant to a tuition reimbursement claim, and so refused to hear the parents' complaint. The parents then petitioned the North Carolina State Board of Education (State Board) to rule either that the hearing officer had authority to hear their claim or, alternatively, to amend the State regulations enacted pursuant to the EHA to confer such authority on him. The State Board denied the parents' petition.

The parents then filed suit under 42 U.S.C. § 1983 against the City Board, the State Board and the chairman of the State Board, C.D. Spangler, Jr., alleging the deprivation of procedural rights secured by the EHA and applicable federal regulations, 34 C.F.R. § 104.31 et seq. Relying primarily on School Committee of Burlington v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the parents alleged that the City Board, acting by and through its duly appointed hearing officer, had deprived them of procedural rights secured by federal law when it refused to decide their tuition reimbursement claim. The parents further alleged that the State Board and Chairman Spangler had deprived them of federally guaranteed procedural rights when it refused to interpret or amend State regulations to permit the hearing officer to decide their tuition reimbursement claim. The parents sought to recover tuition expenses from the City Board or, in the alternative, the following: a declaration that the State rules preventing hearing officers from deciding tuition reimbursement claims violated the parents' rights under federal law, an order enjoining Spangler and the State Board from promulgating and enforcing these rules, and an order compelling the City Board and its hearing officer to conduct a hearing on this particular reimbursement claim. The parents also sought costs and attorneys' fees from all defendants, under 42 U.S.C. § 1988 and 29 U.S.C. § 794a.

On December 31, 1986, the district court granted the parents' motion for summary judgment on the claims for injunctive and declaratory relief, concluding that the EHA required a state administrative hearing at which parents could receive tuition reimbursement as appropriate relief for violations of the Act. S–1 v. Spangler, 650 F.Supp. 1427 (M.D.N.C.1986). On the same day, the district court issued an order directing the City Board and its administrative hearing officer to conduct a hearing on the parents' claim for reimbursement, enter findings of fact and conclusions, and, if appropriate, award reimbursement; and enjoining Spangler and the State Board from further interpreting North Carolina law in a manner inconsistent with the court's interpretation of the EHA. Spangler, the State Board, the City Board, and the administrative hearing officer appealed the district court's decision.

On September 24, 1987, while that appeal was pending, the parents and the City Board agreed to a partial settlement of the case. Under the terms of this settlement agreement, which the district court approved by order entered the same day, the parents agreed to a voluntary dismissal with prejudice of all their claims against the City Board, in return for the City Board's agreement to pay their accrued tuition expenses. The State Board and its Chairman were not parties to the settlement agreement, and the parents did not dismiss any of their claims against them.

In light of these developments, we held for prudential reasons that the appeal was moot. In so doing, we explained that:

> We do not believe that the issues raised in this appeal require immediate resolution because they are capable of repetition yet likely to evade review. Our conclusion is based in large part on a June 17, 1987 Letter Ruling, issued after submission of this appeal by the Office of Special Education and Rehabilitative Services (OSERS) of the United States Department of Education, which has supervisory authority over federal grant-in-aid monies issued to the states under the EHA. The Letter Ruling expressly endorses the holding of the district court in this action, that the

EHA requires states to authorize their hearing officers both to decide parents' tuition reimbursement claims and to order reimbursement where the conditions of *Burlington* are satisfied. Given OSERS's specific disapproval of the State Board's current procedures, we doubt that the precise conduct allegedly violative of federal procedural rights will recur; instead, we would suppose that any remaining doubt about the propriety of the current North Carolina procedures will be resolved shortly without judicial interference. We assume, for the purposes of this analysis, that the State Board and its Chairman will comply in good faith with the OSERS Letter Ruling.

*S–1 & S–2 v. Spangler,* 832 F.2d 294, 298 (4th Cir.1987).

We therefore vacated the order of the district court from which the state defendants had appealed, and remanded with directions to determine "whether and in what amounts attorney's fees should be recoverable against the state defendants," and "to dismiss the remainder of the action as moot." *Id.* (emphasis supplied). Our assumption about the state defendants' likely compliance with the OSERS Letter Ruling was, as it turned out, too sanguine—at least for a time. In 1988 the North Carolina General Assembly did amend Section 115c–116 to allow an administrative law judge presiding over a due process hearing to recommend a decision to the State Board. Yet the final decision remained with the Board, or with two of its members designated to make the decision. 1988 N.C.Sess.Laws ch. 1079 (July 8, 1988).

For this reason, OSERS objected to the revised statute, and threatened to withdraw some $5 million in federal education funds if the State did not comply with federal law by June 30, 1990. Through legislation specifically enacted to preserve these federal funds, the General Assembly again amended Section 115c–116 so that an administrative law judge's findings of fact and conclusions of law would become final unless appealed to the State Superintendent of Public Instruction. If there was such an appeal, the Superintendent could appoint a disinterested educator to enter final findings of fact and conclusions

of law. 1990 N.C.Sess.Laws ch. 1058 (July 28, 1990).

On March 30, 1992, the district court filed a memorandum opinion and order which awarded $30,143.18 in attorneys' fees to the parents, reasoning that "by virtue of Plaintiff's complaint sufficient federal pressure was brought to bear on the State of North Carolina that Section 115c–116 was amended to comply with federal law." The State Board now appeals this decision, arguing that actions taken after this court declared the parents' claim moot cannot serve as a basis for declaring them prevailing parties, that the amendments in question do not support such a determination, and that the OSERS letter opinion was not in response to the parents' claims and was unimportant if it was.

## II

■ At the outset, we reject the State's apparent contention that post-mootness events never can serve to establish § 1983 plaintiffs as prevailing parties for § 1988 attorney fee award purposes. *Rhodes v. Stewart,* 488 U.S. 1, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988), upon which the State relies for this position, does not support any such absolute rule. In that case, it was belatedly realized that before the district court had entered a declaratory judgment in favor of two State prison inmates claiming unconstitutional prison conditions, one had died and the other had been paroled. Because this constitutionally mooted the action, the Supreme Court, where the mooting circumstances were first realized in the course of reviewing an attorney fee award made to the two plaintiffs, held that neither could be found a prevailing party since neither could realize any benefit from the judgment on the merits. *Id.* at 3, 4, 109 S.Ct. at 202, 203.

■ This obviously does not stand for the proposition that once mooting of a § 1983 action occurs, the plaintiffs in the action can never be prevailing parties on the basis of later out-of-court developments. Mooting may have that effect, as it did in *Rhodes* where the mooting events made it impossible for the plaintiffs to prevail in the most basic

sense of realizing any of the benefits sought in the action. But it need not. Whether it does or not is determined by making the established causation-centered test of prevailing party status applied in such cases as *Bonnes v. Long*, 599 F.2d 1316 (4th Cir.1979) (*Bonnes I*). As formulated in that decision, the test requires an

> inquiry [that] is properly a pragmatic one of both fact and law that will ordinarily range outside the merits of the basic controversy. Its initial focus might well be on establishing the precise factual/legal condition that the fee claimant has sought to change or affect so as to gain a benefit or be relieved of a burden. With this condition taken as a benchmark, inquiry may then turn to whether as a quite practical matter the outcome, in whatever form it is realized, is one to which the plaintiff fee claimant's efforts contributed in a significant way, and which does involve an actual conferral of benefit or relief from burden when measured against the benchmark condition.

*Id.* at 1319.

In applying this test we have held that "to get a truer picture of a plaintiff's success [courts] should look outside the final judgment to voluntary actions taken by a defendant so long as those actions are causally connected to the litigation." *Spencer v. General Elec. Co.*, 894 F.2d 651, 662 (4th Cir.1990). And if the inquiry so conducted reveals that the § 1983 action acted as a catalyst for a defendant's actions ultimately favorable to the plaintiff, the requisite causal connection may be found on that basis. *DeMier v. Gondles*, 676 F.2d 92, 93 (4th Cir. 1982).

In making its determination that plaintiffs here were prevailing parties, the district court carefully and specifically applied the *Bonnes I* test as elaborated in *Spencer* and *DeMier*. In reviewing that decision, we start with deference to that court's "ringside view of the relevant conduct of the parties and of the underlying legal dispute," *Alexander v. Cheverly*, 953 F.2d 160, 162 (4th Cir.1992),

and proceed on the basis that "[i]n view of the specter of satellite litigation over attorneys' fees, appellate review of lower court decisions in this area, appropriately, is limited." *Id.* at 161.

Our review reveals no error in the court's decision. The § 1983 action in behalf of S–1 and S–2 claimed that North Carolina's 1985 due process procedures violated the EAHCA in ways that deprived them of benefits to which that statutory program entitled them. The district court's December, 1986 judgment in the parents' favor provided the basis for the OSERS Letter Ruling issued in response to an inquiry respecting a similar situation in June 1987.[1] While the district court's decision may not have "prompted OSERS to issue an official policy statement" as the district court explained, it certainly shaped or at least influenced the OSERS Letter Ruling and thereby its policy in a significant way. With OSERS thus essentially adopting the parents' position and promising to enforce it, that the State would eventually provide the due process amendments the parents sought became almost a foregone conclusion.

As the parents argue and the district court implicitly recognized, the chain of causation between the § 1983 action's commencement, the district court's original decision in the parents' favor, the OSERS Letter Ruling and the State's eventual compliance with it was in no way affected by our mooting of the underlying § 1983 action for prudential reasons. Indeed, our opinion finding the action moot recognized and was in part based on the recognition that this causal chain would remain intact, and that OSERS would probably force the State to comply if it refused to do so.

The State urges that its unwillingness to make those changes the parents and OSERS sought, and the fact that it eventually made them only to preserve federal education funding, should be taken as indications that the parents' suit played no part in the State's actions. "To be pragmatic," the State ar-

---

1. The OSERS Letter Ruling was in response to the inquiry of a Vermont attorney whose clients had been denied reimbursement because the Vermont state reviewing officer had held she had no authority to grant such relief.

gues, "a dead lawsuit has no motivational value compared to $50,000,000 (sic)." Of course, what the State refuses to acknowledge here is that the parents' lawsuit was at least partly responsible for OSERS threatening to withdraw the federal education funding.

To begin with, the parents' suit and its success in the district court must have alerted OSERS to the State's non-complying position, perhaps focusing federal attention on the State earlier than it otherwise would have occurred. More crucially, though, the district court's opinion clearly played a major causative role in the OSERS Letter Ruling and thereby the Department of Education's policy position. Both the timing of the district court's opinion and the text of the Letter Ruling itself confirm the opinion's import.

■ In responding to the initial inquiry which prompted the Letter Ruling, OSERS on November 3, 1986 indicated that since "the matter you present will require a substantial review of legislative history and case law, as well as a thorough analysis of policy implications for each of the other states," OSERS would need sixty days to provide a substantive response. On December 31, 1986, the district court handed down its opinion on precisely the issue OSERS was deciding. The Letter Ruling, issued by OSERS on June 17, 1987, relied heavily on the decision by the district court. Over a third of the text of response was devoted to a discussion of this decision, and OSERS concluded that "[t]he court's reasoning in the *Spangler* decision is sound.... OSERS concurs with the reasoning adopted by Judge Bullock in his *Spangler* decision and shares his opinion that EHA–B requires States to authorize its hearing officers to decide reimbursement claims in an impartial due process proceeding ...".

Given these causal links between the parents' suit and OSERS' actions, the State's insistence that it changed position only to preserve federal funding amounts essentially to an admission that the parents' suit did significantly impact State law, achieving through OSERS pressure what it had originally and successfully sought in the district court. The State's position as now stated only underscores the fact that it would not have changed without the federal pressure, and thus would not have ameliorated its position without the parents' suit.

Finally, the State contends that even if the parents' suit was a significant causal factor in the 1988 and 1990 legislation, the legislation itself was not "required by law," and thus under *Dunn v. The Florida Bar*, 889 F.2d 1010, 1015 (11th Cir.1989), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), the parents were not prevailing parties for purposes of attorneys' fees. The State's argument that the legislation was not required by law is essentially that 20 U.S.C. § 1415(b)(2) provides that parents "shall have an opportunity for an impartial due process hearing" and that "[n]o hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child." The State's position is that because the Board of Education is composed of "constitutional officers" and not "employees," the provisions of § 1415(b)(2) were improperly applied and the changes the State made were not "required by law" as *Dunn* held necessary.

In *Dunn*, however, the Eleventh Circuit explained what it meant in "required by law" by referring to a pair of earlier Fifth Circuit cases. In these, the Fifth Circuit held that "appellants need only show that the action taken by the appellees was 'not a wholly gratuitous response to an action that in itself was frivolous or groundless.' (citation omitted). A claim is not frivolous if it is arguably supported by case or statutory law." *Garcia v. Guerra*, 744 F.2d 1159, 1163 (5th Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497 (1985). "[A] plaintiff who brings an action that has no colorable, or even reasonable, likelihood of success on the merits is not entitled to recover attorney's fees if the defendant simply complies with the plaintiff's demands and moots the case for reasons that have nothing to do with the potential merit of the suit. Whether activated by economic, political, or purely personal concerns, a defendant may choose voluntarily to make the change sought in the suit rather than undergo protracted and expensive litigation."

*Hennigan v. Ouachita Parish School Bd.,* 749 F.2d 1148, 1153 (5th Cir.1985).

■ Clearly, the State did not voluntarily make any changes to avoid litigation in this case; and just as clearly, the changes the parents and OSERS sought and that the State made were at least "arguably supported by case or statutory law" so as not to be frivolous claims on the parents' part. Whether State Board members are "constitutional officers" or "employees" hardly seems to impinge upon their impartiality, which is the concern of § 1415(b)(2). For purposes of attorneys' fees, the State's changes were "required by law," or made in response to a colorable claim.

### III

Since we heard oral argument in this appeal, the Supreme Court has decided *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), in which it was held that plaintiffs who had won only a dollar from one of six defendants in a suit seeking seventeen million dollars were "prevailing parties" under § 1988, but that a fee award of $280,000 was unreasonable given their only nominal success. In its general discussion of prevailing party status, the Court explained that

> to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. *The Plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought. Hewitt, supra,* 482 U.S., at 760, 107 S.Ct., at 2675, *or comparable relief through a consent decree or settlement, Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. *See Hewitt, supra,* 482 U.S., at 764, 107 S.Ct. at 2677. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." *Rhodes,* 488 U.S., at 4, 109 S.Ct., at 203. Only under these circumstances can civil rights litigation effect "the material altera-

tion of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. [*Texas State Teachers Ass'n v.*] *Garland* [*Indep. Sch. Dist.*], *supra,* 489 U.S. [782], at 792–793, 109 S.Ct. [1486], at 1493 [103 L.Ed.2d 866 (1989)] [ (1989) ]. In short, a plaintiff "prevails" when *actual relief* on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. (emphasis added).

*Id.* at ——, 113 S.Ct. at 573.

In a post-argument filing at our request, the State contends that in this passage— particularly the emphasized portions—the Supreme Court has now rejected the "catalyst theory" of "prevailing party" status, as recognized and applied, for example, in our *Bonnes I, DeMier,* and *Spencer* decisions, and now in Part II of this opinion. Under *Farrar's* plain dictate, says the State, a § 1983 claimant can now be found a prevailing party only if his action terminated in an "enforceable judgment against the defendant ... or [produced] comparable relief through a consent decree or settlement." Here, continues the State, there has been neither a consent decree nor a settlement, and the only judgment obtained against the State-defendants was vacated on mootness grounds and therefore is not enforceable.

■ We disagree. We do not believe that, properly read, *Farrar* rejects the catalyst theory of prevailing party status. If the one sentence in *Farrar* that specifies "enforceable judgment, consent decree, or settlement" is lifted out of context and treated as being all the Court said on the subject, it surely could be read as at least an oblique death-knell for the catalyst theory. But the context as defined by the actual issue before the *Farrar* Court and by what else the Court said on the subject belies any such drastic reading.

Given the importance that the catalyst theory long has had in prevailing party doctrine under 42 U.S.C. § 1988, we would expect that if the Court intended to hold it no longer a viable theory it would address the issue head-on in a case in which it was dispositive.[2]

---

**2.** And with a careful elaboration of reasons rather than the cryptic passage of *dicta* which the

dissent says we should read as a "decision that controls this case," *Dissenting Op.* at 172. The

That was not so in *Farrar*. The theory's viability was not an issue in *Farrar*, where plaintiffs had obtained a final judgment, and therefore had no need to invoke "catalyst" theory. The issues in *Farrar* were simply whether (1) a claimant who recovers only nominal damages can ever be considered a "prevailing party", and (2) if so, whether the hefty fee award there at issue could be upheld as a "reasonable" one under § 42 U.S.C. § 1988. The Court never mentioned the catalyst theory, and the passage upon which the State relies occurs, as dicta, in a general discussion of "prevailing party" status.

Furthermore, several earlier decisions of the Court that were cited in *Farrar* as authoritative on the general issue of prevailing party status, *see id.* —— U.S. at ——, 113 S.Ct. at 572–73, had either expressly or tacitly recognized the catalyst theory's viability, or reserved decision on its exact contours. *See Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam) (noting legislative history which "indicates that a person may in some circumstances be a 'prevailing party' without having obtained a favorable 'final judgment' " ... or "without formally obtaining relief"); *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (case remanded specifically to consider whether claimant's "lawsuit was not a catalyst" for achieving favorable result on issue actually decided against claimant); *Kentucky v. Graham*, 473 U.S. 159, 165 n. 9, 105 S.Ct. 3099, 3104 n. 9, 87 L.Ed.2d 114 (1985) ("we express no view as to the nature or degree of success necessary to make a plaintiff a prevailing party"); *Hewitt v. Helms*, 482 U.S. 755, 763,

107 S.Ct. 2672, 2677, 96 L.Ed.2d 654 (1987) ("[w]e need not decide the circumstances, if any, under which this 'catalyst' theory could justify a fee award"). We do not believe that had the Court intended in *Farrar* to abrogate a theory this well-established, it would have cited without comment these earlier decisions which, as a matter of course, recognized its existence and utilization.

Finally, we note that this view of *Farrar's* non-impact upon the catalyst theory is shared by three other circuits which, since that decision, have had occasion to apply the theory with explicit awareness of *Farrar's* discussion of prevailing party doctrine. *See Paris v. U.S. Dept. of Housing & Urban Dev.*, 988 F.2d 236, 241 (1st Cir.1993) (fee award upheld on basis that plaintiff's suit, though unsuccessful on only issue litigated, was "fairly characterized as a catalyst", citing *Farrar's* discussion); *Citizens Against Tax Waste v. Westerville City School*, 985 F.2d 255, 258 (6th Cir.1993) (denial of fee award reversed because justified on catalyst theory; district court error excused on basis that *Farrar* "was not available ... at the time [of] its decision"); *Craig v. Gregg County*, 988 F.2d 18, 21 (5th Cir.1993) (difficulty created by *Farrar* language noted, but found overcome by "[a] more precise reading" which contemplated continued viability of catalyst theory).

We therefore reject the State's contention that *Farrar* has made it no longer proper to find prevailing party status on a catalyst theory, and we therefore stand on our application of that theory in Part II of this opinion.[3]

implausibility of reading that much into it is best illustrated by the very form and extent of the dissent's effort to demonstrate why we should. Rather than simply resting on the plain text of the passages, which we are told at the start suffices, *see id.* at 167, the dissent is then largely and lengthily devoted (Part II, with sub-Parts A, B, C and D), to explaining why catalyst theory is bad theory that should be discarded. *Id.* at 168–71. The suggestion must be that all this was implicit in the *Farrar dicta*, for otherwise the position it advances is flatly foreclosed by long-settled circuit (and general) precedent. But the *Farrar* Court, of course, never intimated that it was engaged in any such thoroughgoing reexamination of catalyst theory. Were it to do so, it is just such an explanation as the dissent gratu-

itously offers in this case that we would expect— and, with all respect, are entitled to expect— when the Court is about something as important as the dissent claims for it here. We think we show respect rather than disrespect for the Court and its processes, and for the values of *stare decisis*, when we act on that expectation.

**3.** The contention might also be rejected on the alternative basis that the finding of prevailing party status here is not dependent upon availability of the catalyst theory in the first place. As indicated in Part II, the plaintiff here did actually obtain an enforceable judgment against the state defendants on the critical issue litigated. And as further indicated there, we do not believe that the later vacatur of that judgment upon our dis-

## IV

Having found no error in the district court's determination that the parents were prevailing parties entitled under 42 U.S.C. § 1988 to attorneys' fees, we affirm.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

I cannot subscribe to the majority's evisceration of the Supreme Court's decision in *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The language of *Farrar* is plain: "[T]o qualify as a prevailing party ... [t]he plaintiff must obtain an enforceable judgment ... or comparable relief through a consent decree or settlement." *Id.* at ——, 113 S.Ct. at 573. "Whatever relief the plaintiff secures must directly benefit him at the time of *the judgment or settlement.*" *Id.* (emphasis added). *"Only under these circumstances can civil rights litigation effect 'the material alteration of the legal relationship of the parties' and thereby transform the plaintiff into a prevailing par-*ty." *Id.* (emphasis added). "No material alteration of the legal relationship between the parties occurs *until* the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." *Id.* at ——, 113 S.Ct. at 574 (emphasis added).[1]

Each of the above statements is now rendered meaningless by the majority's direction to district courts to "look outside the final judgment" and beyond "the merits of the basic controversy" in awarding attorneys' fees under § 1988. Majority Op. at 164. With respect, the resemblance between the Supreme Court's view of fee recovery and that of the majority quite eludes me. *Farrar* states that without a demonstrated legal entitlement, plaintiffs cannot be deemed to have prevailed. The majority states that, notwithstanding *Farrar,* vague "catalyst" theories of causation continue to control who is a prevailing party under 42 U.S.C. § 1988. There is no way, however, that *Farrar* and a broad "catalyst theory" of attorneys' fees recovery

missal of the appeal as moot for prudential reasons should have any effect on the plaintiffs' entitlement to a fee award as prevailing parties. The critical reference point for assessing prevailing party status in a fully litigated case is upon entry of the primary judgment on the merits of the case. A later appellate reversal or vacatur of such a favorable judgment *on the merits* obviously requires reversal or re-examination of a prevailing party determination based upon it. But not one, such as that here, which was not on the merits. *Cf. Maloney v. Marietta,* 822 F.2d 1023 (11th Cir.1987) (preliminary injunction in voting rights case vacated as moot following voluntary compliance by defendants; fees properly awarded to plaintiffs as prevailing parties); *Taylor v. Ft. Lauderdale,* 810 F.2d 1551 (11th Cir.1987) (same, where City passed mooting ordinance following entry of preliminary injunction); *Williams v. Alioto,* 625 F.2d 845 (9th Cir.1980), *cert. denied,* 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981) (same, where police voluntarily ceased enjoined conduct while preliminary injunction on appeal).

The dissent's contention that the vacatur for mootness here should be thought to wipe out the "enforceable judgment" for fee award purposes, *Dissenting Op.* at 168, has an ironic and illogical twist worthy of note. Our dissenting brother joined in the panel decision that directed vacatur of the judgment against the state defendants on mootness grounds, but that remanded with express directions for a determination whether fees should be awarded. *See* 832 F.2d at 298. Un-

less we are prepared to believe him capable of cruel hoax—which obviously we aren't—this must indicate that he didn't at the time think the vacatur would make fee award inappropriate. Even if *Farrar* in the interval were read to require an "enforceable judgment" (or settlement), nothing in that opinion touches the question of the effect of a mootness vacatur on such a judgment once obtained. The exact language in *Farrar* is "obtain an enforceable judgment;" it doesn't add "that is still in effect at the time of fee award." If the *Farrar* passage deserves the literal reading for precedential purposes that the dissent claims for it, it deserves that reading throughout.

1. The majority discards as "dicta" and dismisses as "cryptic" this extended discussion on the part of the Supreme Court whose meaning could not be more clear. *See* Majority Op. at 166–67 n. 2. We are entitled to disregard it, the majority says, because the Supreme Court failed to utter the words "catalyst theory" in the course of its discussion or to elucidate its reasoning in a manner sufficiently "careful" to satisfy the majority. *See id.* The majority makes no attempt to reconcile the Supreme Court's opinion with the continued existence of "catalyst theory." With all respect, this is a nervy course—while a circuit court is necessarily entrusted with the interpretation and application of Supreme Court pronouncements, it is not empowered, *sua sponte,* to set them aside.

can be reconciled.[2] I shall first address the particulars of this case, and then turn to a broader critique of the catalyst theory upon which the majority rests its case.

### I.

Plaintiffs in this case fall short of meeting the rule laid down in *Farrar*. They obtained a judgment on the merits of their claim, but that judgment is no longer enforceable. The judgment's vacatur on appeal renders it a legal nullity. *See S–1 v. Spangler*, 832 F.2d 294 (4th Cir.1987). *Farrar* is explicit on this point: "[t]he plaintiff must obtain an enforceable judgment *against the defendant from whom fees are sought.*" —— U.S. at ——, 113 S.Ct. at 573 (emphasis added). Plaintiffs certainly have prevailed against the City Board via their settlement, but the State Board has not settled and there is no judgment remaining against it.

In crediting plaintiffs' vacated judgment against the State Board, the majority effectively deprives the state defendants in this case of their right to an appeal. And by adopting a porous standard for prevailing party status—that a plaintiff's position be "arguably supported by case or statutory law," Majority Op. at 165—the majority subjects these defendants to liability for attorneys' fees without offering them the opportunity to refute the claims asserted against them. There is a virtue in the recognition that the vindication of legal rights is the proper end of all litigation. Without an *enforceable* judgment or settlement, however, it becomes difficult to discern what legal rights of plaintiffs have been violated or vindicated. This court properly recognized in its earlier decision that defendants had raised a constitutional issue of real "difficulty and sensitivity" involving "the power of the federal courts, acting within the constraints of the eleventh amendment, to interfere by injunction with the internal process of a state administrative agency." *Spangler*, 832 F.2d at 298. The defendants in this case continue to insist that their view of the Individuals with Disabilities Education Act is the legally correct one. The majority never says otherwise—in its view all that is required to award attorneys' fees against these defendants is for plaintiffs to state a "colorable claim." Majority Op. at 166.

The majority attempts to explain away plaintiffs' failure to secure an enforceable judgment by writing off as "dicta" the rule laid down in *Farrar*, Majority Op. at 167. The majority instead clings to a broad catalyst standard for recovery of attorneys' fees under 42 U.S.C. § 1988. The causal story recounted by the majority in this case demonstrates the tenuous connection between a lawsuit and changes in conduct that will suffice to subject defendants to liability for attorneys' fees under catalyst theory. Plaintiffs are found here to have been a "catalyst" for changes made by the State because (1) OSERS agreed with plaintiffs' legal position in a Letter Ruling in an unrelated case, and (2) the State amended its laws three years after plaintiffs' case was mooted, in response to the threatened loss of five million dollars in federal funding.

Even under the expansive standards of catalyst theory, this evidence of causation is astonishingly thin. Plaintiffs' lawsuit lost

---

**2.** The cases from other circuits cited by the majority are no more persuasive in resuscitating catalyst theory. With all due respect, those cases fail to come to grips with *Farrar*'s ruling that "[n]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." —— U.S. at ——, 113 S.Ct. at 574. *Paris v. HUD* simply ignores *Farrar*'s requirement of a legal victory, citing the case only in passing. 988 F.2d 236, 238 (1st Cir.1993). *Citizens Against Tax Waste v. Westerville City School* quotes *Farrar*'s standard in a footnote, but nonetheless invokes *Farrar* in support of a pure catalyst theory to reverse a district court denial of fees. 985

F.2d 255, 258 and n. 3 (6th Cir.1993). In sum, the cases cited by the majority do not come to terms with the inconsistency between *Farrar* and catalyst theory. I would not follow their example.

Finally, in *Craig v. Gregg County*, the court acknowledged the conflict between *Farrar* and catalyst theory, but skirted the issue by finding as a matter of fact that plaintiff had not been a catalyst for the county's reconfiguration of a voting precinct. 988 F.2d 18, 21 (5th Cir.1993) ("A more precise reading of *Farrar* ... *might* suggest that a party may prevail [via catalyst theory]," (emphasis added) but plaintiff "has not shown that *his suit caused* [the defendant's change in conduct].").

whatever force it had as a catalyst the day it was mooted by this court. I do not understand how moot lawsuits, in which the possibility of relief against a party is by definition foreclosed, continue nonetheless to function as catalysts for change and for the recovery of attorneys' fees. In this sense, the majority has stood finality on its head—the "prevailing party" standard in 42 U.S.C. § 1988 requires that we consult the confines of a case, not plumb the legal hereafter.[3]

## II.

Quite apart from the difficulties of applying catalyst theory to this particular case, I cannot agree with the majority's vocal endorsement of catalyst theory as a means of determining prevailing party status under § 1988. The problems with that theory are prodigious.

## A.

First, the catalyst theory of fee recovery conflicts with the plain language of § 1988 itself. Section 1988 allows awards of reasonable attorneys' fees to a "prevailing *party,*" not simply to anyone who influences a change in behavior or policy. 42 U.S.C. § 1988 (emphasis added). For individuals to recover fees, they must prevail in their status as parties, not in their role as agents of reform. And to *prevail* for § 1988 purposes, *parties*

must succeed on the merits of a claim. *Farrar,* —— U.S. at ——, 113 S.Ct. at 573. In other words, success must be something buttressed by a court's authority or required by a rule of law. The lawsuit must materially alter the "legal relationship" between plaintiffs and defendants. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). *Farrar* makes plain that "[n]o material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant." —— U.S. at ——, 113 S.Ct. at 574.

## B.

Second, catalyst theory ignores the Supreme Court's recent decisions. The majority says it is inconceivable that *Farrar* ever intended to disturb something so "well-established" as the catalyst theory for the recovery of attorneys' fees. Majority Op. at 167.[4] Far from overturning a "well-established" theory, however, *Farrar*'s specification of judgments, consent decrees, and settlement agreements as the exclusive avenues to prevailing party status under § 1988 follows from prior Supreme Court caselaw. Before *Farrar,* the Court had noted a supposed fourth avenue. In *Hewitt v. Helms,* 482 U.S.

---

**3.** The "voluntary compliance" cases cited by the majority, *see* Majority Op. at 167 n. 3, are easily distinguishable from the instant case. The cases relied on by the majority reflect only the principle that when a plaintiff is successful in obtaining a preliminary injunction based on its probability of success, the defendant's voluntary cessation of *unlawful* conduct need not deprive plaintiffs of prevailing party status. That is quite different from our case, where the change in conduct occurred in response to a third-party's view after we declared the lawsuit moot, where we have never adjudged the state's conduct to be unlawful, and where we explicitly credited defendants with raising a complex question of federal law which we then declined to address. The inappropriateness of an attorney's fee award against defendants in this latter set of circumstances should be apparent.

The majority purports to see some inconsistency between my position here and my joining the earlier remand to the district court to determine whether fees should be awarded. *See id.* The very terms of the remand presupposed, however,

that the basis for any award would return here for review. Further, the earlier decision itself emphasized that "[b]y remanding we of course express no view on the parents' entitlement to costs and attorney's fees against the state defendants." 832 F.2d at 298 n. 3. I make no apologies for following a Supreme Court decision that has issued between the last appeal and the disposition of this one. Indeed, if the majority believed *Farrar* to be persuasive authority, it presumably would follow it too.

**4.** In this context, the majority's reference to *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), as being a "case remanded specifically to consider whether claimant's 'lawsuit was not a catalyst' for achieving a favorable result," Majority Op. at 167, is anything but an endorsement of catalyst theory. That case involved an award to a "partially prevailing plaintiff" who had actually obtained a judgment on the merits. *Hensley,* 461 U.S. at 426–28, 103 S.Ct. at 1935–36. The issue of prevailing party status simply was not raised.

755, 760–61, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987), the Court observed that a § 1988 fee award could be justified if a lawsuit produced a voluntary "change in conduct" by a defendant that redressed a plaintiff's grievance. With this language, however, the Court did not endorse catalyst theory; it specifically reserved judgment on that question. 482 U.S. at 763, 107 S.Ct. at 2677. Nor did the Court's language extend the ways to attain prevailing party status beyond the three situations later listed in *Farrar*. *Farrar*'s inclusion of settlements between parties encompasses both monetary settlements and agreements to a change in conduct. *See Farrar*, —— U.S. at ——, 113 S.Ct. at 573; *see also Hewitt*, 482 U.S. at 760, 107 S.Ct. at 2675. A plaintiff securing such a settlement can certainly be deemed to have prevailed in the absence of a formal judgment. *See Hewitt*, 482 U.S. at 761, 107 S.Ct. at 2676. *Farrar* merely clarified *Hewitt* by stressing that a voluntary change in conduct must be formalized in a legally enforceable settlement agreement to transform a plaintiff into a prevailing party for purposes of § 1988.

Other cases have similarly clarified *Hewitt*. For example, *Hewitt* stated that the change in a defendant's conduct must redress a grievance. 482 U.S. at 761, 107 S.Ct. at 2676. Cases since *Hewitt* have narrowed this idea of grievance to make it a legal grievance. *See Garland*, 489 U.S. at 792–93 (focusing on the change in "legal relationship"); *Rhodes v. Stewart*, 488 U.S. 1, 3–4, 109 S.Ct. 202, 203, 102 L.Ed.2d 1 (1988) (per curiam) (holding that plaintiffs did not prevail when they were no longer in custody and judgment provided them with no legal relief). In other words, the change in conduct must be enforceable in court, not merely gratuitous. *Farrar*'s specification of the three avenues by which a party can prevail for § 1988 purposes does no more than continue the process of refining *Hewitt*. In its embrace of catalyst theory, the majority not only ignores *Farrar*; it bucks a clear decisional trend.

### C.

Third, the catalyst theory of fee recovery engenders confusion and unnecessary litigation. By providing a clear rule for achieving prevailing party status, *Farrar* promises to reduce litigation over attorneys' fees. The majority's concern over the "specter of satellite litigation," is well-founded, Majority Op. at 164, but the catalyst theory adopted by the majority then proceeds to exacerbate that very problem. Too frequently, legal battles over attorneys' fees merely add another round of protracted litigation to what already has been protracted litigation on the merits of a claim. *Compare Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("A request for attorney's fees should not result in a second major litigation."). This collateral litigation over attorneys' fees is often more heated, more arcane, and over far higher monetary stakes than the underlying lawsuit. The relationship of all of this activity to the larger public good is becoming increasingly difficult to discern. *Farrar*'s crucial insights are that the refuge from such litigation lies in a clearly established rule for fee recovery and that the catalyst-based approach to fee applications has left us utterly at sea.

The majority's standards for fee recovery under catalyst theory fail to chart a clear course through this litigious fog. We are told that the catalyst inquiry is "a pragmatic one of both fact and law that will ordinarily range outside the merits of the basic controversy ... to whether as a quite practical matter the outcome, in whatever form it is realized, is one to which the plaintiff fee claimant's efforts contributed in a significant way," and that "[courts] should look outside the final judgment to voluntary actions taken by a defendant so long as those actions are causally connected to the litigation." Majority Op. at 164 (citations omitted). How far outside the merits should courts look? What is a significant contribution? When is a lawsuit causally connected and when is it not? What is the meaning of "in whatever form" an outcome is realized? The majority does not provide any guidance—only criteria that invite further litigation. In contrast to the majority's approach, *Farrar*'s clear rule ensures that parties deserving attorneys' fees will obtain them without forcing district courts to untangle a web of supposed causal

connections to determine whether a party prevailed.

## D.

Finally, catalyst theory discourages public officials from taking initiatives to revise outmoded ordinances or to improve institutional conditions, because such theory expressly recognizes "voluntary actions taken by a defendant" as a proper basis for a fee award. Majority Op. at 164. With its reliance on a simple chronology of events to show causation, catalyst theory empowers courts to award fees for *any* change in behavior that occurs after the filing of a lawsuit, whether or not the court could have ordered that change in conduct. In this way, catalyst theory serves to disable public officials, who may come to fear that worthwhile changes may be retroactively linked to a lawsuit and result in a hefty bill for attorneys' fees. It is counterproductive to convert § 1988 into a penalty on state and local officials for making salutary changes. At the same time, catalyst theory provides incentives for filing marginal, even frivolous, lawsuits. Any change in conduct by the defendant, for whatever reason, may offer a promising payout to attorneys who file a complaint, whether or not that complaint has any ultimate legal merit. Section 1988 should not be a license to shake down government officials, nor was it ever intended to be simply "a relief Act for lawyers." *Farrar,* — U.S. at —, 113 S.Ct. at 578 (O'Connor, J., concurring), *quoting Riverside v. Rivera,* 477 U.S. 561, 588, 106 S.Ct. 2686, 2701, 91 L.Ed.2d 466 (1986) (Rehnquist, J., dissenting).

Catalyst theory is so open to fee awards because it assumes that enlightened social change automatically results from lawyers pursuing litigation. Unconstrained catalyst theory betrays the disquieting presumption that litigation must somehow lead the march of social progress. With § 1988, however, Congress did not grant parties a license to collect fees for pursuing personal visions of the public good. Rather, § 1988 compensates parties for attorneys' fees incurred in bringing and successfully concluding lawsuits. Congress recognizes litigation under 42 U.S.C. § 1983 as a desired vehicle to vindicate the violation of legal rights, not as a means of effecting social change of the generic sort. In our system of government, we have looked first to elected officials to decide what change may or may not be considered enlightened. Section 1988 does not alter the basic democratic premise. Congress has said that attorneys' fees may be awarded to prevailing parties who have established legal claims. That requires a judgment, consent decree, or settlement.

## III.

Under *Farrar,* plaintiffs with valid civil rights claims will continue to have their day in court, assisted by counsel. Citizens may still "assert their civil rights," and those who would violate such basic rights shall not "proceed with impunity," because parties retain the chance "to recover what it costs them to vindicate these rights *in court.*" S.Rep. No. 1011, 94th Cong., 2d Sess. 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5910 (emphasis added). *Farrar* assures, however, that when a court awards "fees to a prevailing plaintiff, it is awarding them against a violator of federal law," *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978), not against an entity that improves a facility or changes a policy on its own initiative. By contrast, a theory of fee-shifting based upon changes in conduct that judges might consider constructive transfers the evaluation of many public actions to the unaccountable preferences of federal courts.

Plaintiffs in this case have not secured an enforceable judgment, consent decree, or settlement agreement. I would not award them attorneys' fees on the basis that their mooted lawsuit may have operated as a catalyst to subsequent changes in defendants' conduct. With all respect to my colleagues, we have in *Farrar v. Hobby* a Supreme Court decision that controls this case. We should follow it.