# United States Court of Appeals
# for the Second Circuit

_____

August Term, 2023

Argued: February 26, 2024
Decided: September 4, 2024

No. 23-264

_____

MOHAMED MUSAID,

*Petitioner-Appellant*,

v.

MICHAEL KIRKPATRICK, Superintendent of Clinton Correctional Facility,

*Respondent-Appellee*,

STATE OF NEW YORK,

*Respondent*.

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

Before:     CALABRESI, CABRANES, and LOHIER, *Circuit Judges*.

Petitioner-Appellant Mohamed Musaid seeks the writ of habeas corpus. Musaid was convicted in New York state court of the 2007 murder of a relative. Within days of the murder, Musaid was arrested and confessed to the crime. But his case did not proceed to trial for more than eight years because Musaid was repeatedly found incompetent to stand trial. Musaid had a long history of mental illness, and medical professionals who examined him found him incompetent on ten occasions while he awaited trial.

Musaid would oscillate between periodic competence when he took his medication and sustained incompetence when he did not, though his periods of competence were far fewer and shorter than his periods of incompetence. When found competent, Musaid would be transferred from a psychiatric hospital to Rikers Island. There, he would refuse his medication and swiftly return to incompetence.

After a final finding of competency and transfer to Rikers, the state trial court allowed Musaid's criminal trial to proceed. The trial, however, did not start until nearly ten months after this finding. Notably, Musaid had regressed to incompetence in shorter periods after every previous finding of competence.

Musaid argues that it was objectively unreasonable for the trial court to proceed to trial without making even a minimal inquiry into whether he remained competent just before trial. Based on the exceptional record before us—specifically, Musaid's cyclical pattern of regressing from competence to incompetence, his consistent history of such regression after relatively brief of periods of medically-induced competence, his erratic behavior at and shortly before trial, and the importance of his medication to every finding of competence—we agree with Musaid. We further conclude that neither the trial court nor the Appellate Division applied the proper legal standard governing when further inquiry is required.

But we decline Musaid's request that we issue the writ of habeas corpus outright. Instead, we issue only a conditional writ. This allows the state courts to develop the record further and reconsider, in the first instance, whether it is possible, by holding a hearing or by other means, to decide for themselves Musaid's competency at the time of trial based on evidence proximate to the trial.

Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to enter a conditional writ.

Judge Cabranes dissents in a separate opinion.

_____

RANDA D. MAHER, Maher & Pittell, LLP, Great Neck, New York, *for Petitioner*

BRENT E. YARNELL (Steven C. Wu, Chief, Appeals Division, *on the brief*), Assistant District Attorney, *for* Alvin L. Bragg, Jr., District Attorney, New York County, *for Respondent*

_____

CALABRESI, *Circuit Judge*:

Petitioner Mohamed Musaid seeks the writ of habeas corpus. In 2007, Musaid was arrested for the killing of a relative. He immediately confessed to the crime but was not tried and convicted until 2016. The delay is the result of Musaid's extensive history of mental illness. While in the custody of the State of New York, he was diagnosed with Schizophrenia (Paranoid Type), found by medical professionals to be incompetent to stand trial ten times, and repeatedly committed to psychiatric hospitals. When hospitalized, he would receive medication and would, with time, return to competence. After being found competent, however, Musaid would be transferred to Rikers Island Jail ("Rikers"),

where he would decline medication and quickly regress to incompetence once again.

This cycle occurred in full three times. After the fourth time Musaid was found competent, he was not again examined for competency. Instead, the state trial court ordered the start of his trial. Musaid's trial did not start, however, until nearly ten months after he was last examined for competence. Nonetheless, the trial began without so much as an inquiry into whether Musaid remained compliant with his medication, let alone any meaningful inquiry into his competence.

Musaid argues that this was unreasonable and a violation of the Constitution's prohibition against trying defendants when there is reasonable cause to doubt their competence. On the exceptional record before us, we agree. Musaid's history provided ample reasons to doubt that he remained competent after ten additional months at Rikers. That history, together with Musaid's bizarre conduct shortly before and during trial, should have prompted at least a minimal

inquiry into his compliance with medication and his then-existing cognitive state. The trial court's failure to do so was objectively unreasonable.

We decline, however, Musaid's request that we issue the writ of habeas corpus outright. Instead, consistent with the principles of federalism, we issue a conditional writ to allow the state courts to consider whether it is possible to reconstruct Musaid's competence at the time of trial based on evidence proximate to the trial that is not currently in the record before us.

**I.     Factual and Procedural History**

On November 24, 2007, Musaid was arrested for the murder of Rafik Alsamet that occurred three days earlier. Alsamet was shot three times: twice in the back and once in the back of the head. There were two witnesses to the shooting, one of whom knew Musaid and recognized him. Police recovered a gun a few blocks away from the shooting, which testing concluded had fired at least one of the bullets that killed Alsamet. Further testing conducted before trial revealed Musaid's DNA on the gun.

After he was arrested, Musaid immediately confessed to shooting and killing Alsamet.[1] In his confession, Musaid explained his motive for the crime and

---

[1] In this conversation—and in many of Musaid's competency examinations—an interpreter was present and assisted Musaid in communicating.

provided several details relating to the commission of the crime itself. Many of the details Musaid provided, such as the location of the gun, are those that presumably only Alsamet's killer would have known. At the end of the interview, police reduced Musaid's answers to a written confession that Musaid then signed.

In the confession, Musaid stated that he had known Alsamet for roughly fifteen years. They were both immigrants to the United States from Amiq, Yemen, where Musaid was born and met his wife. Musaid's wife, who was a cousin of Alsamet's, remained in Yemen with their three sons. Musaid explained that he killed Alsamet because he believed that Alsamet was sending money to Musaid's wife to allow men to have sex with the three sons of Musaid and his wife.

Six days after Musaid was arrested, a grand jury indicted him on three counts: (1) second-degree murder, in violation of New York Penal Law § 125.25(1); (2) second-degree criminal possession of a loaded firearm with intent to use the same unlawfully, in violation of New York Penal Law § 265.03(1)(b); and (3) second-degree criminal possession of a loaded firearm, in violation of New York Penal Law § 265.03(3).

**A. Musaid's Incarceration and the Cycles of Psychiatric Examinations**

There followed a cycle of psychiatric examinations, competency hearings, and commitment orders that took place over the more than eight years between Musaid's arrest and trial. Musaid's history reveals a clear pattern: (1) after a medical professional's examination concluded Musaid was incompetent, the trial court would find Musaid incompetent and order him committed to a hospital to receive psychiatric treatment; (2) after a period of such treatment (during which Musaid would be forced to take antipsychotic medication), a subsequent examination would find him competent to stand trial; (3) the trial court would then order Musaid returned to the custody of the Department of Correction ("DOC"), and he would be transferred to Rikers; (4) once at Rikers, Musaid would no longer be forcibly medicated, nor would he voluntarily take his medication; and then (5) another examination would conclude that Musaid had returned to incompetence.

This full cycle repeated itself three times. Each time, Musaid returned to incompetence at most within eight months at Rikers. After the fourth time Musaid was found competent, however, the trial court never again ordered Musaid to be re-examined for competency. Instead, nearly ten months after Musaid's last

psychiatric evaluation, the trial court proceeded to trial without any inquiry into his continued competency.

The details of this story are important. Musaid's extraordinary history makes up much of the evidence of competency that was before the trial court on the eve of trial, evidence that should have put the court on notice of the need to inquire into Musaid's continued competency immediately before the trial began. Accordingly, we proceed to walk through the state court record of each cycle in some detail.

### i. The First Cycle: November 2007–September 2009

After his November 24, 2007 arrest, Musaid was held at Rikers. Soon after arriving there, he exhibited "increasingly agitated behavior, paranoid delusions and somatic preoccupation."[2]  App'x at 1105 (quotations omitted).  Specifically, Musaid repeatedly claimed he had a severe kidney condition (despite testing that revealed no issues with his kidneys) and that the physicians at Rikers were poisoning his food.  As a result, he was transferred to Bellevue Hospital prison ward for treatment.  At Bellevue, Musaid refused all psychiatric medications, and

---

[2] An individual with somatic delusions is obsessively preoccupied with the belief that something is grossly wrong with their body when, in fact, that person's body is functioning normally.  *See* DSM-V-TR at 349.

his treating physicians were forced to obtain a court order to administer antipsychotic medications over his objection.

On April 23, 2008, after Musaid had received several months of treatment (including both medication and therapy), the trial court held the first of many hearings on Musaid's competence. At that hearing, Musaid's counsel reported that the Bellevue staff "had been unable to stabilize [Musaid's] condition" and asked the trial court to order a psychological examination. *Id.* at 1431. The trial court issued the order, stating that it was "of the opinion that [Musaid] may be an incapacitated person." *Id.* at 1374. This order prompted the first of the fifteen competency examinations that Musaid would undergo over the span of nearly seven years.

In New York, the process for determining a defendant's fitness to be prosecuted is spelled out in New York Criminal Procedure Law § 730.10–70 ("Section 730").[3] Section 730 provides that an "incapacitated" defendant is someone who "as a result of mental disease or defect lacks capacity to understand the proceedings against [them] or to assist in [their] own defense." N.Y. Crim. Proc. L. § 730.10(1). Under Section 730.30(1), whenever a court believes that a

---

[3] This state statute, of course, does not delineate the contours of Musaid's federal constitutional rights.

defendant "may" be incapacitated, the court "must" issue an order of examination. Following such an order, the defendant must be examined by two independent psychiatric examiners. *Id*. at § 730.20(1). These examiners prepare independent reports, which the court, prosecution, and defense review.

The court then determines, often after a hearing, whether the individual is competent to stand trial. *Id.* at § 730.30. If the court ultimately finds that the defendant is incapacitated, it must issue an order committing the defendant to the custody of the state mental health commissioner to receive treatment, for a period of time not to exceed one year. *Id.* at § 730.50(1). Shortly before this commitment order expires, if the superintendent of the treating facility believes that the defendant is still incapacitated, they must apply to the court for an order of retention, which can last for up to two years. *Id.* at § 730.50(2)-(3). This process can repeat: commitment orders generally cannot exceed a year in duration, while retention orders cannot exceed two-thirds of the authorized maximum term of imprisonment for the highest class of felony charged in the indictment. *Id.* at § 730.50(3).

Following the trial court's April 2008 examination order, two doctors independently examined Musaid on May 12, 2008. Both examiners separately

diagnosed him with "Psychiatric Disorder Not Otherwise Specified," App'x at 1115, 1121, and concluded that Musaid's symptoms prevented him from understanding the proceedings against him and assisting in his own defense.

The examiners noted that, with some prompting, Musaid was able to appreciate the basic aspects of a criminal prosecution, including the roles of the judge, jury, and district attorney. Both examiners, however, separately highlighted four symptoms of psychiatric illness that, they concluded, prevented Musaid from fully understanding the proceedings against him and from assisting in his defense: (1) somatic delusions; (2) conspiratorial thinking; (3) denial of his mental illness and refusal to accept medication for his illness; and (4) an inability to appreciate the seriousness of the charges against him and the potential punishment.

Musaid's somatic delusions revolved around his kidneys. He was preoccupied with the belief that his kidneys were "black," even when confronted with medical testing results showing no issues with his kidney function. *Id.* at 1119. One examiner reported that "[Musaid] [wa]s quite preoccupied with somatic delusions, such as the unsubstantiated belief that he suffers from kidney disease, and he repeatedly shifts unrelated discussions to this irrelevant topic." *Id.*

11

at 1136. Another noted that Musaid could not describe his kidney issues with any more specificity than that they were "black" and was "too delusional" during her examination to discuss "his legal options in a rational manner." *Id.* at 1113, 1115.

Musaid also expressed belief in any number of conspiracies. He believed that his doctors were poisoning him, and he believed that his defense attorney was conspiring with the federal government and had stolen tens of thousands of dollars from him. One examiner wrote that Musaid's thinking was "often vague, illogical, and paranoid" and concluded that Musaid's paranoia reached "the point of delusion." *Id.* at 1114.

Third, Musaid outright denied that he had any mental illness, refused to accept that treatment helped him, and suggested that he would continue refusing medication. In fact, Musaid claimed that the only reason he was "not right in the head" was *because* of the medications he was given: those medications were "shredding [his] brain," he said. *Id.* at 1119. He also claimed that his medications were the source of his alleged "black" kidneys, even though his kidney complaints started before he began taking psychiatric medication. *Id.*

Finally, Musaid was "quite certain that he would be released from jail soon," without ever going to trial. *Id.* at 1115. One examining doctor noted that, after

explaining to Musaid that he would have to go to trial if he entered a not-guilty plea, Musaid refused to accept that basic reality. Instead, Musaid stated, "[t]hey will just let me out." *Id.* at 1120. Both examiners concluded that Musaid was too delusional to discuss his case "in a rational manner." *Id.* at 1115, 1121.

After receiving these reports, on June 18, 2008, the trial court found Musaid to be incapacitated and issued a one-year commitment order. Six days later, Musaid was admitted to the Kirby Forensic Psychiatric Center for treatment. Upon his admission, the Kirby staff described Musaid's thinking as "illogical" and noted that "he expressed paranoid and persecutory beliefs regarding his legal case." *Id.* at 1105. Kirby doctors diagnosed him with "Schizophrenia, Paranoid Type," and prescribed him antipsychotic (olanzapine) and antidepressant (escitalopram) medications. *Id.* at 1105–06.

By March of 2009, after more than eight months of treatment at Kirby, Musaid demonstrated improvement: he was "less paranoid, less preoccupied with somatic delusions and better able to appreciate the seriousness of his legal situation." *Id.* at 1106. A forensic psychologist at Kirby examined Musaid and concluded that he had a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual

understanding of the proceedings against him." *Id.* at 1104.  The psychologist found that Musaid was not preoccupied with somatic delusions, did not display conspiratorial or delusional thinking, and was willing to work with his defense attorney because he no longer believed that his defense attorney was part of a conspiracy against him.  He also demonstrated an awareness of his plea options and appeared to be able to weigh the risks and possible rewards of different courses of action.

Crucially, at this follow-up competency examination, Musaid acknowledged that he had a mental illness and that he needed to take his prescribed psychiatric medications to treat that illness effectively.  Indeed, the Kirby psychologist concluded that Musaid's willingness to take his medication was central to his continued competency: "If Mr. Musaid stops taking his medication, it is likely that his thinking will become increasingly paranoid and illogical, impeding further progress toward resolving his legal situation."  *Id.* at 1109.

After this March 2009 evaluation, subsequent medical records indicate that Musaid was discharged from Kirby and transferred back to Rikers.  Soon after he returned to Rikers, however, Musaid stopped taking his medications and began

demonstrating symptoms of psychiatric illness again. He complained of kidney pain and broken bones, yelled and banged his fist against the walls for hours, and believed that the Rikers staff was putting hair in his food.

#### ii. The Second Cycle: September 2009–September 2011

On September 9, 2009, the trial court ordered another round of psychological examinations pursuant to Section 730, despite Musaid's insistence that he "want[ed] to be tried." App'x at 1416. Musaid was then readmitted to Bellevue Hospital for treatment on September 20, 2009. Bellevue staff had to obtain another court order to inject forcibly a long-acting antipsychotic medication (first fluphenazine and later olanzapine) because of his continued refusal to accept the treatment. Even after several months of these injections, Bellevue staff reported that he "remained agitated, intrusive, pressured"; that he exhibited "palpable" anxiety, "pressured and rambling" speech, "rigid, illogical, irrelevant, and tangential" thinking; and that he was "preoccupied with somatic and persecutory delusions about his prescribed medications." *Id.* at 1140. Specifically, Musaid claimed that the medications were "moving my brain." *Id.*

On November 4, 2009, Musaid was once again examined for competency. And once again, just six months after his return to DOC custody, two examiners

found Musaid incompetent and recommended continued psychiatric hospitalization.

In finding Musaid incompetent to stand trial, one examiner reported that while Musaid was able to discuss the basic aspects of criminal prosecutions, "he steadfastly and insistently display[ed] a paranoid persecutory belief system including towards the treating doctors at Bellevue." *Id.* at 1129–30. He again repeatedly complained about his kidneys and stated that he believed his medications were poisoning him. And as one examiner wrote, "[h]e ha[d] no insight into his mental illness or the need for ongoing psychiatric treatment. He repeatedly beseeche[d] the examiners to return him to Rikers Island, rather than to Bellevue Hospital, so he [could] discontinue medication." *Id.* at 1136.

Importantly, one doctor noted that "[w]henever the defendant is returned to Rikers Island[,] he automatically refuses to take his medications and inevitably deteriorates . . . ." *Id.* at 1128.

Following these reports, on November 24, 2009, the trial court again concluded that Musaid was incapacitated and issued a second one-year commitment order. Musaid was readmitted to Kirby six days later, and there again diagnosed with Paranoid Schizophrenia.

On September 27, 2010, after nearly a year of additional treatment at Kirby, a psychologist at the hospital examined Musaid and found him "barely fit." *Id.* at 1141. This prompted an additional examination of Musaid by a psychiatrist, who concluded that Musaid was "perhaps barely fit while in the hospital and compliant with medication," but warned that Musaid was "intent on stopping his medication at the earliest possibility."[4] *Id.* at 1144. In the psychiatrist's view, although Musaid might have been approaching competence while being treated with a "long-acting injection of antipsychotic medication" at Kirby, if he were discharged from the hospital and returned to Rikers, "the level of medication in his system [would] drop over a couple months once he starts to refuse, and this [would be] likely to render him unfit before his case [could] be settled." *Id.*

As a result, Kirby applied to the trial court to retain custody of Musaid. On January 14, 2011, the court concluded that Musaid was still incapacitated and granted an order of retention, to last for a period of 22 months.

In February 2011, Musaid was transferred to a new ward at Kirby and became temporarily compliant with a new antipsychotic medication

---

[4] This report benefitted from information provided by Musaid's sister, who claimed—against Musaid's own claims—that Musaid had "an extensive history of mental illness and psychiatric treatment in his home country of Yemen." *Id.* at 1140.

(paliperidone), which he initially "consistently accepted." *Id.* at 1149. At this point, for the first time, Musaid's treatment team became concerned that Musaid was malingering (feigning or exaggerating his illness). These concerns were supported by two observations: that Musaid may have been exaggerating his inability to speak English, *id.* at 1149, and that he appeared to "pretend[] ignorance of various legal concepts that he had previously mastered," *id.* at 1155.

Accordingly, his treatment team referred him to yet another psychiatrist, Dr. Michal Kunz, for a competency examination. In a report dated May 25, 2011, Dr. Kunz described substantial improvement in Musaid's condition. Specifically, he wrote that Musaid's somatic preoccupations did not completely impair his ability to focus on his case and that Musaid did not "interject any delusional thinking into his discussion of legal decision-making strategies." *Id.* at 1150. On the other hand, even though Musaid was voluntarily taking his medication at that time, the report notes that Musaid described an intention to stop taking his medication if he left the psychiatric hospital. Musaid's stated reasoning was that he "d[id] not need psychiatric medications" because he was not mentally ill. *Id.* at 1154.

Ultimately, Dr. Kunz described Musaid as competent. But he did so with qualifications. First, he noted that "[c]ontinuing psychiatric treatment is a

prerequisite for Mr. Musaid maintaining his [competent] status." *Id.* Second, recognizing that Musaid might refuse to take his medication, Dr. Kunz recommended that Musaid be transferred back to Bellevue Hospital prison ward so that "his acceptance of the medications can be better assured" than it would be at Rikers. *Id.* at 1154.

This recommendation, however, appears not to have been followed. Instead, in or around June of 2011, Musaid was returned to Rikers.[5] And, sure enough, around three months later, his condition had deteriorated once again. Musaid had now completed the second cycle, managing only three months before returning once again to incompetency.

### iii. The Third Cycle: September 2011 – May 2012

On September 28, 2011, the trial court held another hearing and issued a third Section 730 examination order. A month later, a clinical psychologist and a forensic psychiatrist each examined Musaid pursuant to the trial court order. Both deemed him incompetent to stand trial. Their reports indicate that Musaid's symptoms–including somatic delusions and conspiratorial thinking–had

---

[5] Though Musaid's location during this period is not explicit in the record, subsequent medical records documenting each of Musaid's admissions to Bellevue do not indicate that Musaid was transferred anywhere except Rikers.

reemerged. One examiner concluded that Musaid "could not incorporate information provided by his lawyer." App'x at 1166.

Upon receiving these reports, on November 16, 2011, the trial court again found Musaid incapacitated and, for the third time, ordered him committed to a psychiatric institution for further treatment.

Musaid was returned to Kirby two days later. Upon admission, Musaid had "frequent somatic complaints regarding his kidneys" and displayed "disordered and illogical thinking" which "precluded attempts to engage him in a meaningful discussion about his available choices and possible consequences." App'x at 1172. His treatment team noted that Musaid "seemed to begin complaining when certain clinicians [were] observing him and stop when they were not looking." *Id.*

After starting Musaid on another course of paliperidone, Musaid's medical team saw substantial improvement within a few weeks. Accordingly, less than two months after he returned to Kirby, Musaid was examined for competency by another clinical psychologist, Dr. Catherine Mortiere. In an interview on January 13, 2012, Musaid "stated that he believe[d] he ha[d] a mental illness, 'Schizophrenia,' and knows the name and functions of his medication." *Id.* at 1176. He also agreed "to take his medication once discharged to Rikers." *Id.*

Still, to ensure that Musaid followed his regimen of medication, Dr. Mortiere recommended—like Dr. Kunz had before—that Musaid be housed at a DOC hospital rather than at Rikers. *Id.*

Following this report, Musaid was returned to DOC custody on or around February 2012. Unfortunately, Dr. Mortiere's suggestion was not followed. Upon his return to DOC custody, Musaid was again incarcerated at Rikers. And, again, his symptoms quickly returned. This time, Musaid was sent to a DOC hospital on May 9, 2012, after roughly three months at Rikers. At that time, he was described as "an imminent danger to himself or others": he was "depressed, sleeping on the floor, having multiple psychosomatic complaints," and was refusing to take his medications. *Id.* at 1182. Musaid had, for a third time, become competent with treatment only to regress swiftly upon returning to DOC custody.

### iv. The Partial Fourth Cycle: May 2012–April 2015

On May 23, 2012, the trial court held another hearing and again issued an order sending Musaid for a competency examination. This time, each examiner interviewed him twice: one time in June and another time in September. Once again, both examiners independently deemed Musaid unfit. Musaid, according to the examiners' reports, was somatically preoccupied and exhibiting conspiratorial

thinking about his attorney and the pending prosecution. One doctor remarked that Musaid's court-ordered medications were "not enough to improve his insight into his need to continue the medication" and concluded that it was "not clear that Mr. Musaid [could] get any better." App'x at 1192.

Upon receiving these reports, on November 19, 2012, the trial court judged Musaid to be incapacitated and, for the fourth time, ordered him committed to a psychiatric hospital. This time, Musaid was committed to the Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson") rather than Kirby. Musaid would remain at Mid-Hudson for nearly two years (except for one short period ahead of a competency hearing).

When Musaid arrived at Mid-Hudson on December 5, 2012, his condition was particularly poor. He was "easily agitated, becoming violent [in] several incidents in which he attacked staff," *id.* at 1195, and he "was observed to be internally preoccupied, talking to himself, [and] verbalizing several somatic delusions [such as] claiming to have broken bones and having his internal organs damaged," *id.* at 1196. "He was not cooperating with his lawyer and could not talk about his legal problems due to his fixation on his imaginary medical problems." *Id.* at 1196. And he still refused to take any medication. Mid-Hudson

prescribed Musaid with olanzapine, the drug on which he had demonstrated significant improvement at Kirby. This time, however, Musaid showed little improvement even after several weeks of receiving the maximum dose permitted. He was then started on a course of haloperidol decanoate, another antipsychotic. Musaid did not respond to this medication either.

As the end of his year-long commitment at Mid-Hudson approached, Musaid's attending physician and psychiatrist, Dr. Osiris H. Rivas, believed that he was still incompetent to stand trial because, though he showed "significant improvement in his aggressive behavior," there was "limited change in his psychosis." App'x at 1420. As a result, on October 18, 2013, Mid-Hudson applied for an order of retention that would commit Musaid for an additional year. In support of this application, Dr. Rivas wrote that Musaid "lack[ed] an ability to deal with his legal situation due to his psychotic thinking which deprives him of his capacity to discuss the charges against him and cooperate with his attorney rationally and factually." *Id.* at 1426.

Musaid opposed the application through the Mental Hygiene Legal Service ("MHLS"), the state agency responsible for representing people committed to psychiatric hospitals. Accordingly, a retention hearing was held before the trial

23

court on December 16, 2013. Dr. Rivas testified at length and was cross-examined by MHLS. He explained that a pattern existed whereby Musaid would be found competent but would refuse to take his medication after he was returned to DOC custody and would quickly return to incompetency. Dr. Rivas agreed that Musaid needed to "obtain further insight into his mental illness [and] continue taking his medication at Rikers." *Id.* at 30.

On cross-examination, the MHLS attorney asked if Musaid was malingering. Dr. Rivas replied: "I don't believe that he is malingering. I believe that he's a truly sick person . . . ." *Id.* at 40.

Musaid also testified. On direct examination, MHLS asked Musaid only three short questions: if he knew what he was charged with, if he would agree to work with his lawyer, and if he would agree to listen to his lawyer. Musaid answered yes to all of these questions.

On cross-examination, the People asked Musaid a few more substantive questions. His responses were erratic and conspiratorial. For example, the People asked Musaid about his relationship with his attorney. Musaid responded with a lengthy explanation of his belief that his attorney had stolen $48,000 from him. And, when asked why he kept complaining about medical issues (alleged liver,

24

kidney, and heart problems), Musaid insisted that it was because these conditions were real and Dr. Rivas was lying.

The trial court then attempted to question Musaid. In response to the first few questions, Musaid rambled about how his attorney had stolen funds from him. The trial court asked Musaid about his alleged medical problems, and Musaid's response covers several full pages in the transcripts. Musaid's reply included a number of conspiracy theories, including that he had been poisoned five years prior by doctors at a DOC hospital and that his doctors were trying to kill him.

After allowing Musaid to proceed at some length, the trial court cut Musaid off and rendered its decision, as follows: "Based upon today's hearing, the Court's satisfied that the defendant continues to be an incapacitated person and I will issue an order of retention." *Id.* at 50. Musaid then pleaded with the court to reverse course: "My heart is broken, my kidney, I don't want to go, tell them I don't want to go to the hospital. Why do you want to send me to the hospital, why?" *Id.* at 51.

Musaid was returned to Mid-Hudson for an additional year. After another year of treatment, however, Mid-Hudson reported that "he remain[ed] psychotic . . . . He [was still] paranoid and believe[d] that his internal organs

[were] damaged and his bones [were] broken." *Id.* at 1196. As the latest one-year commitment order neared expiration, on October 17, 2014, Mid-Hudson submitted an application for a second order of retention. In support of this application, Dr. Rivas submitted a report explaining that Musaid was still "unable to work with his attorney due to his distorted thinking and having his own irrational perception of his legal situation." *Id.* at 1200.

Musaid once again opposed the retention application, and he was discharged back to Rikers on December 5, 2014, to await an evidentiary hearing. That hearing was held before the trial court on February 24, 2015. Dr. Rivas testified, again, that Musaid had "not been responding to treatment" and was still "unable to understand the courtroom procedure." *Id.* at 59. Dr. Rivas further testified that Musaid "could not work with his attorney especially because he had a delusion that the attorney ha[d] stole[n] from him $47,000," at which point Musaid audibly interjected "$48,000." *Id.* at 60.

The trial court pressed Dr. Rivas on why Dr. Rivas believed that Musaid could not work with his attorney. The court asked if Dr. Rivas reached his conclusions because Musaid insisted that he was innocent, something that "many defendants insist on," or because of Musaid's delusions. *Id.* at 67. Dr. Rivas

replied that his conclusion was based on Musaid's conspiratorial delusions—for example, that his attorney had stolen money from him—and not on Musaid's protestations of innocence.

After Dr. Rivas's testimony, the trial court held several off-the-record discussions from the bench. When the hearing resumed, the trial court explained that Musaid's criminal defense attorney had been replaced with a new attorney. The trial court questioned Musaid: "That's what you want; correct?," and Musaid asked, "Okay. But how am I going to get my money back . . . ?" *Id.* at 72. The trial court replied that the allegedly stolen money was a separate issue and concluded by ordering another round of competency examinations because it was "unable to determine" if Musaid was incapacitated at that time. *Id.* at 1224.

This next round of examinations occurred on March 11 and April 15, 2015. These were the final examinations before Musaid was tried and convicted the following year.

The reports from these examinations (the "April 2015 reports") describe continued symptoms of psychosis while Musaid was at Rikers. For example, a mental health clinician at Rikers noted that, rather than malingering, Musaid may have been "minimizing the presence of psychotic symptoms," even though

Musaid himself complained that "being in jail and waiting is making my symptoms worse." *Id.* at 1212 He remained "100% non-compliant with med[ication]s" and was observed talking to himself. *Id.* at 1211–12. And on each of February 10 and 16, 2015, Musaid remarked that he had not heard voices in "three days." *Id.* at 1211.

The reports also indicate that, just as Dr. Kunz and Dr. Mortiere had predicted, Musaid continuously refused to take his medications. On December 29, 2014, a note described Musaid as "100% non-compliant," while a March 9, 2015 note described him as "poorly compliant." *Id.* In one note from January 2015, a clinician wrote that Musaid still "lack[ed] insight [in]to his diagnosis and the importance of medication." *Id.* And a note from March 12, 2015, states that Musaid remained in "complete denial of illness." *Id.* Moreover, Musaid "continued to evince multiple somatic preoccupations," which "necessitat[ed] intermittent redirection by the examiners back to the subject of the interview and his legal issues." *Id.* at 1213.

Nonetheless, both clinicians who examined Musaid in March and April 2015 found Musaid competent. They noted that Musaid had a basic understanding of criminal proceedings at both interviews: He knew the name of his new defense

attorney and could, in general terms, describe the role of his attorney, the DA, the judge, and the jury. *Id.* at 1205–06. To be sure, Musaid's thinking remained, at best, paranoid and conspiratorial—he described the judge, for example, as "aligned with the district attorney," *id.* at 1206, and he speculated that the judge and the government "maybe are plotting to kill me," *id.* at 1213. He was also "resolute that if he believed himself innocent, then it would not be possible to lose at a trial," "certain" that there was "no proof" against him, and convinced that "he made no potentially inculpatory statements." *Id.* One examiner noted that Musaid was housed in a mental health unit at Rikers, where he claimed he was willing to take an oral antipsychotic but sometimes missed doses of his medicine. *Id.* at 1207. Musaid also complained that his medication caused him to feel stiff, shaky, and dizzy and "expressed worry about the treatment he was receiving as well as fears 'they are going to kill me about this medication.'" *Id.* at 1221–1222. Musaid denied having a mental illness and said that he was "sometimes" locked in his cell for a day or two at a time because he would scream somatic complaints. *Id.* at 1207. He reported, however, that "10 correctional officers simultaneously hit him on his kidneys." *Id.*

Yet despite Musaid's "residual suspiciousness," one examiner described his conspiratorial thinking as "without clear-cut or elaborated delusional thinking" and noted that he "was able to discuss his legal situation without undue digressions to paranoid themes." *Id.* at 1214.

Both examiners noted improvement in Musaid's willingness to consider all options in his case. In response to a hypothetical fact pattern in which the government had an eyewitness identification or DNA evidence linking Musaid to the crime, Musaid stated that he would "of course" consider a plea bargain in such a situation.[6] *Id.* And one examiner noted that Musaid "appeared well related to and trusting of [his new] assigned counsel." *Id.*

Based on these interviews and the reports from medical staff at Rikers, both examiners found that Musaid was not incapacitated. *Id.* at 1204, 1217. They represented that Musaid "[self-]reported ongoing adherence to prescribed antipsychotic medication" and had "revealed understanding of the charge and allegations against him." *Id.* at 1214. Thus, they concluded, Musaid "presently

---

[6] As referenced in the discussion of the evidence against Musaid, DNA testing of the gun was not done until after the trial court found Musaid competent. Thus, the discussion of DNA evidence was hypothetical at this point.

possesse[d] [a] sufficiently rational and factual understanding of the proceedings against him." *Id.* at 1215.

After receiving the findings of the two examiners, the trial court issued an order on April 22, 2015 deeming Musaid competent to proceed to trial. *Id.* at 1224–25. That brief order explains the decision as follows: "After carefully considering [the two examiners'] conclusions and the examinations on which they were based, the court is satisfied that the defendant is no longer an incapacitated person." *Id.* at 1225.

### B. Pretrial and Trial

#### i. Pretrial Insanity Defense Hearing

Musaid's case did not proceed to trial quickly for reasons that are unclear in the record. Musaid's next appearance before the trial court occurred in a pretrial hearing on January 11, 2016, nearly nine months after Musaid was found competent to stand trial. This hearing regarded a notice filed by Musaid's defense counsel of intent to present psychiatric evidence in support of the affirmative

defense of "lack of criminal responsibility by reason of mental disease or defect."[7]

*Id.* at 1227.

During the hearing, the trial court tried to ask Musaid a few questions related to the trial. But before the trial court could get through its initial instructions about the hearing, Musaid interjected, "What is trial?" *Id.* at 827. This prompted the trial court to ask Musaid's counsel, "Is he ready to go?" *Id.* Musaid's counsel responded, "Yes, he is," and the trial court continued with its instructions. *Id.* When the court remarked, "we are about to set your case down for a trial so a jury can decide the issues in this case," Musaid asked, "[t]he jurors?" *Id.* At the hearing, Musaid expressed his innocence directly ("I'm innocent," *id.* at 833) and a belief that he might simply be released ("I didn't do it. I didn't do it. I don't understand. I don't know what happened"; "If they don't un cuff me to let me go in the street I will go for that trial," *id.* at 828–30). The trial court asked Musaid whether he wanted to allow his attorney to present evidence at trial related to the affirmative insanity defense. Musaid's convoluted answers required the trial court

---

[7] Under New York law, a person is not criminally responsible when, at the time the crime was committed and as a result of mental disease or defect, they lacked substantial capacity to know or appreciate either (1) the nature and consequences of such conduct or (2) that such conduct was wrong. N.Y. Penal Law § 40.15.

to ask for clarification repeatedly. Ultimately, the trial court understood Musaid to be rejecting any psychiatric defense. *Id.*

### ii. Trial

Jury selection began on February 1, 2016, with opening statements the next day. At that point, it had been nearly ten months since Musaid was last examined for competency. Musaid argues in this petition that his behavior at trial should have prompted the trial court to reconsider his competency. In contrast, the Respondents argue that Musaid's behavior at trial supports the conclusion that he was malingering. The trial record contains evidence of various interruptions by Musaid, which the parties interpret differently. For example, during jury selection, Musaid interjected, "I'm innocent," after a prosecuting attorney asked a question of a juror who referenced Musaid. *Id.* at 813.

Before the jury entered on the first day, Musaid spoke directly to the judge: "I have health problem [sic], your Honor. My heart, my lung, my heart, my kidney, my arm. And the police hit me around this area . . . . The ribs, the ribs broken. He [sic] need some help." *Id.* at 311. Later in that exchange, Musaid raised the issue of his continued receipt of his medication: "[T]hey didn't give me my medication. I didn't take anything this morning . . . . Somebody get in touch with

them. They supposed [sic] to give me medication with the food and make me stiff and maybe [sic] me trembling." *Id.* at 314. The trial court simply replied that it would "work on that" and called in the jury without hesitation. *Id.* at 314. Musaid continued to complain that various body parts were in pain and that he was dying and needed to go to the hospital.

Musaid also interrupted the proceeding in other ways. For example, he fell out of his chair and landed on the floor at the end of one day of the proceedings. After this incident, the trial court stated, "[t]he defendant just took a soft landing to the floor[,] which is not unusual for him." *Id.* at 481. At another point, after Musaid fell to the floor yet again, the trial court said: "I'm certain this is intentional. It is all an act. It's pretty clear. It's been pretty clear for years now because this is a routine he's done before." *Id.* at 639. Musaid later fell to the ground yet another time.

The trial court also addressed Musaid's health complaints and his allegations of violence by Rikers staff for the record:

> This morning the defendant complained about a number of injuries, his thumb, his ribs, and various other parts of his body. He has done this repeatedly through the pendency of this case which was a number of years and also claims some of the injuries are inflicted by the Department of Correction. This has been investigated,

and defendant has been brought to the hospital many times by the Department of Correction. Each time no injury. . . .

This has been a strategic [choice] of his since day one. It may be a strategy to garner some kind of bail conditions, but it's truly been untrue allegations by the defendant.

*Id.* at 383.

In response to the implication that Musaid was strategically lying about his plainly nonexistent health conditions, Musaid's defense counsel argued that the fact that Musaid complained of physical health issues when none existed did not support the theory that Musaid was malingering. Instead, he noted that Musaid's somatic delusions were a "symptom of his chronic schizophrenia." *Id.* at 384. Additionally, Musaid's counsel confirmed that his client was also engaged in "obsessive" discussion of these somatic delusions during private conversations in the courthouse holding facility, outside the earshot of the judge and the jury. *Id.* In other words, although Musaid was clearly mistaken about his health conditions, there was reason to believe that his complaints were the result of his mental illness.

Ultimately, the jury found Musaid guilty of both charges. *Id.* at 814–15. After the jury was dismissed, Musaid once again expressed his innocence: "I'm not guilty, Judge." *Id.* at 817. Musaid also made several remarks suggesting that he

was confused about the court procedures: "What happened now? What happened now, Judge? . . . I'm not guilty. What happened, Judge? I want to do trial again. I want to do trial again." *Id.*

Musaid was sentenced on April 12, 2016, almost one year to the day after he was found competent to proceed. *Id.* at 818. Musaid's counsel explicitly raised the issue of Musaid's competency at the sentencing:

> [O]ne of the components of fitness is obviously his ability to assist in [his own] defense. And that's an open question that I have because . . . he's pretty much refused or opposed any kind of legal advice or assistance I could have accorded him prior to trial, during and after the trial.

*Id.* at 822.

The trial court responded that "[c]learly, the defendant does suffer from psychiatric issues; however, he certainly was fit for trial." *Id.* at 824. The court then sentenced Musaid on the Second-Degree Murder conviction to the "maximum allowable under the law" of twenty-five years to life. *Id..* For the charge of Criminal Possession of a Weapon in the Second Degree, he sentenced Musaid to five years of imprisonment and five years of post-release supervision. The two sentences were to run consecutively.

**C. Post-trial Proceedings**

Musaid appealed his conviction and sentence to the Appellate Division of the New York Supreme Court. In those proceedings, he raised substantially the same arguments against the validity of his conviction that he raises in this appeal. The Appellate Division affirmed his conviction and sentence in a brief decision. *People v. Musaid*, 91 N.Y.S.3d 93 (1st Dep't 2019). That decision held that "the most recent set of expert reports provided no indication that [Musaid] was unable to understand the proceedings and assist in his defense," *id.* at 94 (quotation marks omitted), and that "there was nothing in [his] behavior during trial that obligated the court to order yet another examination, sua sponte," *id.* at 95. Significantly, the Appellate Division did not discuss whether the passage of time between the "most recent set of expert reports," id. at 94, and the trial itself—nearly ten months—required "yet another examination," *id.* at 95.

Musaid sought leave to appeal to the New York Court of Appeals, which Judge Garcia denied. *People v. Musaid*, 33 N.Y.3d 979 (2019).

In August 2019, Musaid filed a timely petition seeking the writ of habeas corpus in the United States District Court for the Southern District of New York. [8] On October 31, 2019, the District Court (Torres, *J.*) ordered the Superintendent of Clinton Correction Facility to answer Musaid's petition and referred the case to Magistrate Judge Robert W. Lehrburger. After further briefing, Judge Lehrburger issued a 141-page Report and Recommendation on Musaid's petition. Judge Lehrburger concluded that "[d]eference imposed by federal statutory law . . . compels denial of Musaid's petition." *Musaid v. Kirkpatrick*, No. 19-CV-7944-AT-RWL, 2021 WL 9969436, at *1 (S.D.N.Y. July 20, 2021). In so doing, however, Judge Lehrburger stated that "Musaid's extensive, fluctuating history of incompetency, warranted holding a competency hearing rather than simply relying on those reports and issuing a decision." *Id.* at *52.

---

[8] Musaid also filed a motion for appointment of pro bono counsel and a guardian ad litem, which was later granted. Dist. Ct. Dkt. 6, 13. The motion noted that the Legal Assistance Program of the Clinton Correctional Facility was assisting Musaid with his application because of his psychiatric disorders. Dist. Ct. Dkt. 6 at 2. At the time of the motion's filing, it explains, Musaid was housed in the Intensive Care Program unit, which houses incarcerated people with "severe mental and social issues." *Id.* at 3. Musaid was "being forced—by court order—to take monthly injections to make [him] competent," resulting in "'zombifying' side effects." *Id.*

A fellow inmate assisting Musaid with his habeas petition provided a sworn affidavit alongside the motion for appointment of counsel. The affidavit explains that Musaid was "disturbed" and that his mental condition cycled between being "*almost* competent enough to understand the appellate process" shortly after receiving his monthly injections to "an absolute fantasy world of going home" as the end of the monthly cycle approached. Dist. Ct. Dkt. 6 Ex. C at 1–2 (emphasis in original).

Judge Torres adopted Judge Lehrburger's recommendation over objections from Musaid. *Musaid v. Kirkpatrick*, No. 19-CV-7944-AT-RWL, 2023 WL 1342161 (S.D.N.Y. Jan. 31, 2023). Nonetheless, Judge Torres concluded that "reasonable jurists could debate" whether Musaid was entitled to relief and granted Musaid a certificate of appealability pursuant to 28 U.S.C. § 2253(c). *Id.* at *5.

Musaid timely appealed to this Court.

**II.    Discussion**

Musaid raises three arguments on appeal: (1) that the trial court's April 2015 competency finding was objectively unreasonable; (2) that the trial court's failure to make any inquiry into his competency at any point after declaring him so was objectively unreasonable; and (3) that the trial court's failure to inquire further into Musaid's waiver of a psychiatric defense was objectively unreasonable. Each of these failures, he argues, violated his Fourteenth Amendment right to Due Process. Because we agree with Musaid regarding the second of these three arguments, we do not address the other two.

**A.    Standard of Review**

We review de novo a district court's denial of a petition for writ of habeas corpus. *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011). Our ultimate review of

such petitions, however, is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs federal court review of habeas petitions.  Pursuant to AEDPA, where, as here, the claim raised by the petition was "adjudicated on the merits in State court proceedings,"[9] a federal court shall grant the writ only if the relevant state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state-court decision is contrary to clearly established federal law when "it applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  An unreasonable application of clearly established federal law occurs when "the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).

---

[9] On appeal, the Parties do not dispute that Musaid exhausted his state court remedies as required by 28 U.S.C. § 2254(b)(1)(A).

Unreasonable in this context means more than merely incorrect; a state court's application of Supreme Court precedent must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A state court's *factual* determinations are presumed to be correct—a presumption that can be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Deference, however, does not by definition preclude relief. "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

**B. The Constitutional Violation Musaid Alleges**

AEDPA provides that a state prisoner may petition for habeas corpus in federal court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

criminal trial of an incompetent defendant violates the Due Process clause of the Fourteenth Amendment. *See Drope v. Missouri*, 420 U.S. 162, 172 (1975) ("[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial."); *see also Ryan v. Gonzales*, 568 U.S. 57, 65 (2013) (same); *accord Pate v. Robinson*, 383 U.S. 375, 385 (1996). This principle has its roots in English common law: Blackstone wrote that an incompetent defendant should not stand trial because such a defendant could not "make his defense." 4 William Blackstone, *Commentaries on the Laws of England*, 24–25 (Univ. of Chicago Press 1979) (1769); *see also* 1 Matthew Hale, *Pleas of the Crown* 34–35 (1736).

Competency to stand trial thus turns on the defendant's ability to participate in the legal process. Criminal defendants are incompetent to stand trial if their "mental condition is such that [they] lack[] the capacity to understand the nature and object of the proceedings against [them], to consult with counsel, and to assist in preparing [their] defense." *Drope*, 420 U.S. at 171.

Given the importance of this principle, trial courts themselves are obligated to ensure that the state does not prosecute incompetent defendants. As we explained in *Nicks v. United States*, 955 F.2d 161 (2d Cir. 1992), "the Supreme

Court . . . [has] held that where the evidence raised a sufficient doubt as to a defendant's competence to stand trial, the failure of the trial court to conduct a competency hearing [or inquiry] *sua sponte* violates due process." *Id.* at 168 (citing *Pate*, 383 U.S. at 385); *accord Drope*, 420 U.S. at 180; *Cooper v. Oklahoma*, 517 U.S. 348, 354 n.4 (1996); *Saddler v. United States*, 531 F.2d 83, 87 (2d Cir. 1976); *Smith v. Rock*, 344 F. App'x 656, 657 (2d Cir. 2009) (citing *Nicks*, 955 F.2d at 168 and *Pate*, 383 U.S. at 385).[10] That is, whether defense counsel raises the issue of competency is of no moment. Trial courts have their own responsibility to protect the rights of criminal defendants who may be incompetent. *See Nicks*, 955 F.2d at 168; *see also Glasser v. United States*, 315 U.S. 60, 71 (1942) ("Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused."). Because this constitutional right spans the duration of a criminal proceeding, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."[11]

---

[10] *See also* N.Y. Crim. Proc. L. § 730.30 ("[T]he court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person.").

[11] Though this obligation is Constitutional in nature, Congress emphasized its importance by also codifying it in statute: "The [trial] court . . . shall order [a competency] hearing on its own motion[] if there is reasonable cause to believe that the defendant" may be incompetent. 18 U.S.C. § 4241(a); *see United States v. Arenburg*, 605 F.3d 164, 169 (2d Cir. 2010) (per curiam).

*Drope*, 420 U.S. at 181; *see also United States v. Arenburg*, 605 F.3d 164, 168 (2d Cir. 2010) (per curiam).[12]

In determining whether there are reasonable grounds for such an inquiry, "[t]here are . . . no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180. But "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, [and] even one of these factors standing alone may, in some circumstances, be sufficient." *Id.*

Of course, this inquiry is separate from the question of whether the defendant is in fact incompetent—a question that may require a more substantial showing than what is required here. *See Medina v. California*, 505 U.S. 437, 450

---

[12] One might ask whether *Drope* and *Pate* create clearly established law. As far as we can tell, every circuit that has considered the issue has concluded that they do. *See, e.g., Johnson v. Norton*, 249 F.3d 20, 26–27 (1st Cir. 2001); *Harris v. Kuhlmann*, 346 F.3d 330, 350 (2d Cir. 2003); *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007); *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000); *Flugence v. Butler*, 848 F.2d 77, 79 (5th Cir. 1988); *Mackey v. Dutton*, 217 F.3d 399, 411 (6th Cir. 2000); *McManus v. Neal*, 779 F.3d 634, 656 (7th Cir. 2015); *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996); *Marks v. Davis*, 106 F.4th 941, 968 (9th Cir. 2024); *Walker v. Att'y Gen.*, 167 F.3d 1339, 1345 (10th Cir. 1999); *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1256 (11th Cir. 2002).

(1992).[13]   Here, we do not address whether Musaid was in fact incompetent. Rather, we address the different question of whether the objective facts demanded at least an *inquiry* into Musaid's competence.   In other words, whether it was objectively unreasonable to have determined that no reasonable ground existed to suggest that Musaid was incompetent.   The Supreme Court has already recognized that this procedural protection—a "further inquiry"—is *required* when reasonable grounds remain.  *Drope*, 420 U.S. at 180; *Pate*, 383 U.S., at 385–86.

Thus, we emphasize that the question before us is not whether the trial court arrived at an "unreasonable determination of the facts" pertaining to Musaid's competence.   Instead, we must review whether the trial court overlooked or unreasonably applied the *Drope* standard when, on the eve of trial, it proceeded as

---

[13] In *Medina*, the trial court ordered a competency examination and upheld the constitutionality of a California law that allocated the burden of proving incompetence at the hearing to the defendant.  *Id.* at 446–50. But as *Medina* said, "the question whether a defendant whose competence is in doubt may waive his right to a competency hearing is quite different from the question whether the burden of proof may be placed on the defendant once a hearing is held. The rule announced in *Pate* was driven by our concern that it is impossible to say whether a defendant whose competence is in doubt has made a knowing and intelligent waiver of his right to a competency hearing." *Id.* at 450. For as Justice Blackmun in his dissent explained further, "[t]his Court expressly has recognized that one of the required procedural protections is 'further inquiry' or a hearing when there is a sufficient doubt raised about a defendant's competency . . . the only question before the Court in this case is whether—as with the right to a hearing—placing the burden of proving competence on the State is necessary to protect adequately the underlying due process right." *Id.* at 458–59.  There is therefore no inconsistency between a presumption of competency in the ultimate evaluation and a requirement to test for competency when competency is in doubt.

if the undisputed facts of Musaid's psychiatric history did not "create[] a sufficient doubt of his competence to stand trial" such that "further inquiry on the question" was required. *Drope*, 420 U.S. at 180; 28 U.S.C. § 2254(d)(1).

Musaid claims that, on the eve of trial, the trial court unreasonably failed to recognize that the well-established facts of his psychiatric history gave rise to the very sorts of doubts articulated in *Drope*, *Pate*, and their progeny and that his bizarre behavior before and during trial provided a complementary or independently sufficient ground to question his competency.[14]  To resolve this claim, we must determine whether, based on the evidence that was available to the trial court at the time, it was an unreasonable application of clearly established federal law not to make even a minimal inquiry just before trial into whether Musaid lacked the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense. *See Harris v. Kuhlmann*, 346 F.3d 330, 355–57 (2d Cir. 2003) (habeas relief is warranted based on a failure to conduct a competency examination if we find that "it was *objectively unreasonable* for the state trial court to have concluded . . . that the

---

[14] *See Silverstein v. Henderson*, 706 F.2d 361, 367 (2d Cir. 1983) (*"*New York law provides the procedural protection *Pate* requires.  The New York Court of Appeals has held that when the demeanor of the defendant or other evidence raises doubt as to his competence to stand trial, it is the trial court's duty to order a hearing *sua sponte*.").

circumstances *did not* present a reasonable ground for believing that [the petitioner] was incompetent." (citing 28 U.S.C. § 2254(d)(1))); *see also Silverstein*, 706 F.2d at 369 ("We have held that the trial court must order a hearing when there is reasonable ground for believing that the defendant may be incompetent to stand trial." (quotation marks omitted)). Based on the evidence in the record, we conclude that it was.

**C.    The Trial Court's Failure to Conduct Even a Minimal Inquiry into Musaid's Competence Was Unreasonable**

As a preliminary matter, the Appellate Division did not explicitly address the question before us, namely, the trial court's failure to hold a competency hearing or make any inquiry into Musaid's competence just before trial. Instead, after affirming the trial court's April 2015 competency finding, the Appellate Division said only that "there was nothing in defendant's behavior during trial that obligated the court to order yet another examination." *Musaid*, 91 N.Y.S.3d at 95.

*Drope* specifically charges courts to consider, among other things, "any prior medical opinion on competence to stand trial . . . in determining whether further inquiry is required," 420 U.S. at 180, not only a defendant's contemporaneous

behavior. In other words, the question is not whether a defendant's behavior alone obligated a court to further inquire, but instead whether there was *any* reasonable ground to doubt a defendant's competency, in which case an inquiry is constitutionally required. *See id.*

Musaid was hospitalized as incompetent during most of the eight year-pendency of his prosecution. He was examined for competency fifteen times over approximately seven years. Ten of those examinations found him incompetent; only five found him competent. And these reports highlighted the tenuous nature of Musaid's competency: each report finding Musaid competent attributed his improved condition to a consistent regimen of antipsychotic medication. In fact, several reports explicitly warned that if Musaid ceased taking his medication, as he had in every previous stint at Rikers, he would quickly return to incompetency. *See* App'x at 1109, 1154.

Indeed, after the first three times Musaid was found competent, subsequent psychological examinations determined that he had quickly returned to incompetency. These examinations were conducted shortly after Musaid was found fit—within eight months, at most. After the April 2015 reports, however, he was never examined for competency again.

Musaid's trial began nearly ten months after the April 2015 reports. Yet the trial court—despite having presided over the entire pendency of Musaid's prosecution and, as a result, having intimate knowledge of Musaid's psychiatric history—did not conduct even a minimal inquiry into Musaid's competence immediately ahead of trial nor did it provide reasons on the record, during trial or shortly before, for declining to do so. Instead, the trial court appears to have merely accepted the continued viability of its ten-month-old finding and considered its due-process obligation fulfilled.[15] In light of Musaid's psychiatric history—specifically, his cyclical returns to incompetency after temporarily reaching medically-induced competency—the trial court's failure to conduct such an inquiry was objectively unreasonable.

Musaid's medical history is exceptional and provides the trial court with overwhelming evidence of the extreme nature of his mental illness separate and apart from his behavior alone. Across fifteen psychiatric examinations, every single examiner concluded that Musaid was profoundly ill. Not one, even among

---

[15] We note, again, that the trial court did not conduct any inquiry into Musaid's competence during trial either, even after Musaid's counsel alerted the court that Musaid was again exhibiting somatic delusions. Nor did it conduct any inquiry when, at Musaid's sentencing, Musaid's counsel told the trial court that he considered Musaid's competency during trial an "open question" because "he's pretty much refused or opposed any kind of legal advice or assistance I could have accorded him prior to trial, during and after the trial." App'x at 822.

those examiners who found Musaid competent to stand trial, believed that he was a healthy man who was feigning all of his symptoms.

Still, five reports found Musaid competent, including the April 2015 reports upon which the trial court relied. But the contents of those reports only highlight the tenuous nature of Musaid's periods of competency. Each report finding Musaid competent noted that Musaid's medication resulted in his improved condition. And several explicitly warned the trial court that if Musaid ceased taking his medication, as he had in previous stints at Rikers, he would return to incompetency.

Indeed, the first report that found Musaid competent warned that "[if] [] Musaid stops taking his medication, it is likely that his thinking will become increasingly paranoid and illogical, impeding further progress toward resolving his legal situation." App'x at 1109. The second report that found Musaid competent recommended that he be held at a psychiatric hospital rather than Rikers because "[c]ontinuing psychiatric treatment is a prerequisite for Musaid maintaining his Fit status." *Id.* at 1154. The third examiner to find Musaid competent made the same recommendation. And the April 2015 reports that the

trial court ultimately relied on rested heavily on Musaid's self-reported willingness to take medication.

We have previously held that pretrial competency findings are not dispositive of competence to stand trial where time passes between the competency finding and the beginning of trial. *See United States v. Arenburg*, 605 F.3d 164 (2d Cir. 2010) (per curiam). In *Arenburg*, we examined a trial court's reliance on a magistrate judge's finding of competence two months before trial, which in turn relied on a doctor's report of a competency examination that took place less than four months before trial. We explained that a trial court's "obligation to be vigilant . . . does not disappear upon a pretrial finding that a defendant is competent to stand trial." *Id.* at 170. That "principle is particularly true," we explained, "where the magistrate judge's finding was made nearly two months prior to the trial."[16] *Id.*

---

[16] Likewise, in *Silverstein v. Henderson*, 706 F.2d 361 (2d Cir. 1983), we granted a habeas petition based on the trial court's failure to order a further competency examination where "there were sufficient indicia of incompetence before the trial court to require a hearing." *Id.* at 369. There, the "state trial court had before it the reports of three psychiatrists." *Id.* We held that "[t]he mere fact that the last of these reports found the petitioner competent to stand trial did not suffice to settle the question, given that two psychiatrists had submitted contrary reports just a few days before." *Id.* Instead, the "doctors' disagreement gave the trial court reasonable grounds for doubting that Silverstein was competent to stand trial. Moreover, this doubt could only have been reinforced by the presentence report noting Silverstein's long institutional history and earlier diagnoses finding him retarded and possibly schizophrenic." *Id.*

Applied to Musaid's case, this principle is all the more powerful. The trial court was aware that Musaid's competence was tenuous and reliant on his compliance with medication. And the trial court was aware that Musaid's psychiatric history was punctuated by cyclical returns to incompetence in periods far shorter than ten months. Musaid's history makes plain that the trial court was mistaken to rely solely on out-of-date evidence of his competency.

Accordingly, the trial court had "reasonable cause" to question whether Musaid was adequately medicated and remained competent after nearly ten additional months in Rikers. *Arenburg*, 605 F.3d at 169. Its decision not to follow up on the question of Musaid's competence and the Appellate Division's affirmance of the same because "there was nothing in defendant's behavior during trial that obligated the court to order yet another examination," *Musaid*, 91 N.Y.S.3d at 95, were "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1).

In the end, far from merely a reasonable ground, there was definite evidence to suggest that Musaid might have returned to incompetency shortly before or during trial. Nevertheless, the trial court—ten months after finding Musaid competent—declined to inquire again as to his competency despite objective

evidence which compelled an inquiry. As a result, the court never again made a clean factual finding that Musaid had a rational and factual understanding of the proceedings and a present rational capacity to consult with his lawyers about his defense. Thus, we cannot infer that the decision to proceed to trial was based on an independent judgment *"implicitly* keyed to the appropriate legal test." *McManus v. Neal*, 779 F.3d 634, 658 (7th Cir. 2015).[17]

In other words, it is conceivable that reasonable minds can differ about whether Musaid was in fact minimally competent shortly before and during trial. But reasonable minds cannot differ that there were strong objective grounds to question whether he was. And the due-process inquiry not only asks whether the defendant had a present factual and rational understanding of the trial proceedings and the capacity to assist his lawyers with a reasonable degree of rational understanding, *see Dusky*, 362 U.S. at 402, but also requires that a trial

---

[17] In *McManus*, the court explained what nature of inquiry would have been sufficient:

> The judge might have conducted his own on-the-record colloquy with McManus to check his understanding of the proceedings and his capacity to assist in his defense. If that had happened, we might be able to conclude that the judge made a reasonable independent judgment about McManus's competency. After all, a defendant's competency to stand trial is a legal inquiry, not a medical inquiry, and the judge is the expert on what mental capabilities the litigant needs in order to be able to assist in the conduct of the litigation . . . . But that did not happen here.

*Id.* (quotation marks omitted).

court fulfill its continuing obligation to assure itself of the same, *see Nicks*, 955 F.2d at 168; *Glasser*, 315 U.S. at 71; *Drope*, 420 U.S. at 181. The record suggests that the trial court did not do so.

We do not need to determine *how* the trial court could have fulfilled its obligation to ensure Musaid's competence. It may well be that these doubts could have been assuaged without an entirely new set of competency examinations. For example, had the trial court determined based on contemporaneous medical records or witness testimony that Musaid remained compliant with his medication, its constitutional obligation to ensure Musaid's competence to stand trial might have been fulfilled. But the trial court made no such inquiry. In view of the numerous grounds on which to doubt Musaid's continued competence, that failure was objectively unreasonable.

Respondent's arguments do not persuade us otherwise. It argues that the trial court fulfilled its obligation to ensure Musaid's competence for three main reasons: (1) the trial court did, in any event, inquire into Musaid's competency in a colloquy with his counsel; (2) the April 2015 reports indicated that Musaid was now compliant because he was receiving a new medication, and the state court reasonably weighed those reports more heavily than the older ones; and (3) the

trial court's conclusion that Musaid was malingering foreclosed any reasonable doubt as to his competency.

First, Respondent-Appellee contends that the trial court *did* affirmatively inquire about Musaid's continued competency. It points to the following colloquy from the pretrial conference in January:

> THE COURT: So, Mr. Musaid, we are here to set your trial date, but I'm going to ask you a few questions, okay? So listen to my questions and I'm going to ask you for answers to these questions, and then after that if there is some concerns you have I'll hear you. But first let me ask you a few questions. So we are about to set your trial, and at a trial there are a number of defenses that –
>
> THE DEFENDANT: What is trial?
>
> THE COURT: Is he ready to go?
>
> DEFENSE COUNSEL: Yes, he is.
>
> THE DEFENDANT: Fine.

*Id.* at 827. Respondent argues that, in asking if Musaid was "ready to go," the trial court asked if he was competent to stand trial. Accordingly, it argues that the response by Musaid's counsel represented to the court that the defense counsel believed Musaid was competent. Respondent argues that the trial court relied on

this representation and reasonably concluded that there was no doubt Musaid remained competent.

But Respondent makes far too much of this exchange. Nowhere does either the trial court or defense counsel reference competency outright. *See McManus*, 779 F.3d at 658 n.10. And "ready" would serve as a strange stand-in for "competent" or "fit," both of which are terms of art well-known in the legal community (and both of which are used throughout the record by all speakers addressing Musaid's fitness for trial).

Further, Respondent's reading of this exchange is foreclosed by context. Because the exchange occurred at the beginning of a pretrial hearing to determine whether Musaid would waive an insanity defense, the clear reading of the exchange is that the trial court was asking Musaid's counsel whether Musaid was "ready," as in "prepared," to respond to questions about whether he sought to pursue an insanity defense. This eight-word exchange clearly did not address, much less settle, the long-litigated question of Musaid's competency to stand trial.

Our conclusion is bolstered by comments made by Musaid's counsel at sentencing just a few months later. There, Musaid's counsel stated his view that Musaid's competency was "an open question" and that Musaid's behavior

exhibiting incompetency remained the same "prior to trial, during and after the trial." App'x at 822. It is implausible that Musaid's counsel would so quickly dispose of the issue of competency in pretrial proceedings and then claim that he has long viewed Musaid's competency as questionable. Importantly, the trial court did not react with surprise when Musaid's counsel made these remarks. If the trial court had understood Musaid's counsel to have represented in the earlier exchange that Musaid was competent, this about-face would have prompted some response.

Second, Respondent contends that it was reasonable to rely on the ten-month-old April 2015 reports to conclude that Musaid remained competent without further inquiry into his current status. They argue that these reports indicate that Musaid was, for the first time, willing to take medication at Rikers and that this was due to a change in medication. Hence, they aver, it was reasonable to rely on these reports to conclude that Musaid would likely remain medicated and competent, even after a ten-month period.

Musaid's history contradicts these arguments. The April 2015 reports, if anything, highlight the importance of Musaid's willingness to take medication—a willingness that the examiners obviously considered to be tenuous in light of

Musaid's history and his contemporaneous complaints of the medication's side effects.[18]  And a short period of compliance with a new medication does not erase Musaid's long history of noncompliance.  (Indeed, Musaid's history demonstrates that he had previously been briefly compliant with a medication before subsequently rejecting that medication.[19])  Further, it was particularly unreasonable to rely on the April 2015 reports to foreclose any questions about whether Musaid was still receiving medication because, just before trial, Musaid raised a question about whether he was adequately receiving and accepting medication.  *Id.* at 314.  Accordingly, reliance on these reports cannot render reasonable a decision to ignore Musaid's eight-year-long psychiatric history and proceed to trial without further inquiry.

Third, Respondent argues that the trial court's failure to inquire into Musaid's competence was not error because the trial court reasonably found that he was malingering.  It is true that the state court, during the trial itself, concluded that Musaid was malingering at least some of his symptoms.

---

[18] Nor did those examiners inquire as to whether Musaid intended to continue taking his medication.

[19] For example, in May 2011, one examining doctor noted that Musaid was accepting medication and found him fit.  Accordingly, Musaid was transferred to Rikers.  Three months later, however, Musaid's condition had deteriorated after he refused that once-promising medication, and he was once again found incompetent to stand trial.

The scope of the trial court's malingering finding is somewhat unclear, however. To the extent that when the trial court indicated that Musaid's behavior has been malingered since "day one," App'x at 383, it intended to convey a view that Musaid's symptoms had been manufactured since the court first encountered him, this finding is clearly contradicted by overwhelming medical evidence and the trial court's own findings from the previous seven or so years. In fact, the trial court specifically credited earlier factual findings that determined that these symptoms—the same ones that Musaid exhibited at trial—were not fake.

In any event, this argument misses the point. It is not necessarily the factual determination about Musaid's malingering that violated Musaid's constitutional rights. Instead, the trial court erred because it failed to apply the correct standard when it declined to inquire further into Musaid's competency. In fact, the trial court failed altogether to determine that no reasonable grounds existed to doubt Musaid's competence, as it was required to do before proceeding. Nor, on the record before us, could it have made such a determination given the substantial objective grounds to doubt Musaid's competency at the actual time of trial.

And, as previously mentioned, the Appellate Division considered Musaid's competency finding by the trial court made 10 months before the trial (which we

do not question) and Musaid's behavior only during the actual trial and thus unreasonably applied the federal standard clearly established in *Pate*, *Drope*, and their progeny. These errors exist even if Musaid was in fact malingering.[20]

This case is thus distinguishable from *Harris v. Kuhlmann*, 346 F.3d 330 (2d Cir. 2003), the primary authority on which Respondent relies. In *Harris*, the petitioner was examined by a psychiatrist to assess whether he was competent to stand trial. *Id.* at 334. Harris was never found incompetent, however; indeed the *only* finding in the record confirmed that Harris was competent to stand trial. *Id.* at 337–39. Defense counsel later "suggested" that the court order a further examination, though counsel failed to furnish any evidence suggesting that the defendant was incompetent. *Id.* at 335. Moreover, unlike this case, the trial court in *Harris* actually performed a minimal inquiry in order to assure itself of the defendant's competence to stand trial. *Id.* at 335–36.

---

[20] Further, even crediting the subsequent conclusion that Musaid was malingering does not foreclose reasonable doubts as to his competency. For example, a trial court could conclude that a defendant was exaggerating some, but not all, of their symptoms. Or a trial court could conclude that the best interpretation of the evidence was that a defendant was malingering while reasonable cause to doubt that conclusion remained. That is, the conclusion that something is the best interpretation of the evidence does not, in and of itself, foreclose all reasonable doubts about that interpretation. And many of the symptoms Musaid exhibited were the same ones that previous examinations determined would interfere with his ability to think logically and rationally about his case, assist his attorney in his defense, and withstand the stresses of trial.

*Harris* is distinguishable in another way. The indicia of incompetence were not only much weaker there than here, but were also discredited by the trial court.[21] Moreover, there was no period of sustained incompetence punctuated by periodic displays of medically-induced competence. Here, Musaid's history of incompetence is much longer and more well documented than Harris's, and Musaid's symptoms evidencing incompetence proved to be much more severe.

\* \* \*

The issue before us is not whether Musaid was competent at trial. The question is whether his medical history and erratic behavior before and during trial created <u>objective doubt</u> as to his mental competency at trial. *Drope* and its progeny hold that, as a matter of law, where there is reason to doubt the defendant's competence, a trial court cannot reach a competency determination without further inquiry. 420 U.S. at 180. In failing to conduct such an inquiry, the trial court utterly failed to fulfill this core obligation before proceeding to trial.

---

[21] The R&R in this case appears to misread *Harris* and related case law in a fundamental way. The R&R states "When, as here, there is some evidence of incompetency, but also some evidence of incompetency [sic], it is not objectively unreasonable to conclude that there was not reasonable ground to believe that a defendant may have been incompetent." *Musaid*, 2021 WL 9969436, at \*64. Our case law does not suggest, as the R&R interprets it, that any time there is evidence of incompetency but also evidence of competency, the trial court's determination not *to engage in any inquiry* is reasonable without a qualitative assessment as to the evidence on both sides to ensure that no reasonable ground to doubt the defendant's competency remained.

Our opinion in *Arenburg*, in which we expressed doubt about reliance on a two-month-old competency determination, acknowledges that competency is fleeting. Defendants often move in and out of competency relatively quickly, as Musaid had on several occasions. Although we remain "reticent to saddle [trial] courts with the requirement of conducting multiple competency hearings during the course of a criminal proceeding," *Arenburg*, 605 F.3d at 170, the Constitution's command is clear: courts must ensure a defendant's competency to stand trial whenever reasonable grounds to doubt that competency arise. *See Nicks*, 955 F.3d at 168. That such competency inquiries are a disruption is no justification to ignore this Constitutional requirement.

In this case, the record amply demonstrates that Musaid had severe mental health issues. His competency depended on antipsychotic medication that he would often refuse to take, thereby prompting a rapid return to incompetency. Considering this undisputed history alone or in tandem with Musaid's bizarre behavior, the trial court had objective reason to doubt Musaid's continued competency just before and during his trial.

Instead of inquiring into Musaid's competency, however, the trial court proceeded as if its ten-month-old competency finding alone was sufficient. But

against the record before us, we know that it was not. The standards established in *Drope, Pate, Dusky*, and their progeny require more. The trial court's (and Appellate Division's) failure to grapple with this inquiry under those standards was an objective failure to demonstrate to us that it ensured that Musaid was prosecuted, convicted, and sentenced in accordance with his Fourteenth Amendment rights.

**D.    The Remedy**

Musaid asks us to issue the ultimate writ. But the great writ "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). Instead, a conditional writ is appropriate in this case.

If Musaid were incompetent at the time of trial, his conviction would be invalid. However, if evidence from that time that is not currently in the record before us—because of the trial court's failure to investigate Musaid's competence just before trial—permits the trial court to conclude that Musaid was competent at the time of his trial, his conviction should remain undisturbed. The trial court's error in not inquiring further into Musaid's competence would then be harmless. For that reason, rather than issue the writ outright, we issue a conditional writ to allow New York courts to evaluate for themselves whether such evidence exists.

*See Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) ("Federal habeas corpus practice . . . indicates that a court has broad discretion in conditioning a judgment granting habeas relief."). In so doing, we do not traverse the trial court's determination of Musaid's competence based on data nearly a year old. We simply require the trial court to determine if it can judge Musaid's competence on the basis of evidence that is truly proximate to the trial.

New York courts take much the same approach under similar circumstances "to determine whether sufficient evidence may be developed to reconstruct defendant's mental capacity at the [relevant] time . . . and, if so, to determine whether defendant was competent." *People v Pett*, 50 N.Y.S.3d 663, 665 (4th Dep't 2017) (quotation marks omitted). Under New York law, the trial court's task is to determine "[i]f . . . it is feasible to conduct a reconstruction hearing concerning defendant's competency at the [relevant] time" and "if the People meet their burden at the reconstruction hearing of establishing defendant's competency . . . by a preponderance of the evidence." *Id.* If "the People fail to meet their burden of establishing defendant's competency at the [relevant] time . . . or if it is not feasible to conduct a reconstruction hearing, then . . . the judgment and [conviction] should be vacated and further proceedings on the

indictment should be conducted." *Id.* at 665–66; *see also United States v. Auen*, 846 F.2d 872, 878 (2d Cir. 1988).

More than eight years have passed since Musaid's trial. It may now be impossible for the state court to determine whether Musaid was competent on the eve of trial. Indeed, the Supreme Court has found the challenges presented by shorter periods sufficient to preclude retrospective competency determinations. *See Dusky*, 362 U.S. at 403 (one year and two months); *Drope*, 420 U.S. at 183 (six years); *Pate*, 383 U.S. at 386–87 (six years); *but see Jordan v. Lefevre*, 293 F.3d 587, 594 (2d Cir. 2002) ("We decline Jordan's invitation to rule that the passage of nine years makes reconstruction of the record [for a *Batson* challenge] infeasible as a matter of law . . . ."); *Saddler v. United States*, 531 F.2d 83, 87 (2d Cir. 1976). There is reason to believe that technological advances—for example, electronic systems that more easily permit mass storage of records—may allow for retrospective competency determinations that were impossible generations ago when those cases were decided. Nonetheless, allowing the state court to make that determination in the first instance is best aligned with the federalism values underlying our justice system.

Given that such a hearing might prove infeasible, we only direct the state court to consider whether to conduct a hearing to determine Musaid's competence just before trial. If the state court determines that it cannot hold a hearing to reconstruct Musaid's fitness at the relevant time, or if it holds such a hearing and determines that it is not sufficiently convinced that Musaid was competent at the time of trial, issuance of the writ would be appropriate unless the state brings Musaid to trial within a reasonable time with a finding that he is competent for such a trial. *See Silverstein*, 706 F.2d at 369.[22]

## CONCLUSION

We **REVERSE** the district court and **REMAND** with instructions to **GRANT** a conditional writ of habeas corpus as described above.

---

[22] Contrary to the dissent's claim, the majority decision does not mean that Musaid "walk[s] free." Dissent Op. at 1. A conditional writ allows the state courts to consider holding a reconstruction hearing or pointing to other evidence not currently in the record before us that Musaid was fully medicated and competent at the time of trial. If they cannot do so, the People can retry Musaid upon determining that he is currently competent. A finding that Musaid is now incompetent and that his competency cannot be restored would nearly compel the conclusion that the case should not have been tried in the first place. We emphasize again that contrary to the dissent's claim, the majority opinion does not purport to "second-guess[] the State Court's" finding of competency. *Id.* Rather it grants conditional habeas relief only insofar as the State Court clearly applied the wrong federal legal standard or at the very least applied the governing legal standard unreasonably to the facts of this case when it failed to do anything to make sure that its competency finding was still valid ten months later. Whether Musaid is legally responsible for Rafik Alsamet's murder is in no way before us. Accordingly, nothing in this opinion should be construed to express any view on that issue.

*Musaid v. Kirkpatrick*, **No. 23-264-pr**

JOSÉ A. CABRANES, Circuit Judge, dissenting:

In 2007, Mohamed Musaid approached Rafik Alsamet on Lenox Avenue and fired three hollow-point bullets into Mr. Alsamet's back and head, killing him instantly. After two consecutive court-appointed doctors found Musaid competent to stand trial, and the State Court (Gregory Carro, *Justice*) inquired *sua sponte* into his competence immediately before trial, a jury convicted him for murder in 2016.

Seventeen years after the murder and eight years after trial, the majority has deemed itself the better arbiter of Musaid's mental state than the experienced State Court judge. In doing so, the majority distorts Supreme Court precedent and flouts the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") by second-guessing the State Court's entirely correct course of action. Because the majority's "improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA,"[1] does serious harm to the law of our Circuit governing habeas, I respectfully dissent.

## I. The Majority's Approach Cannot Be Squared with AEDPA

I cannot agree with the majority's decision to effectively let Musaid walk free. The State Court did not err, much less unreasonably err, in declining to order yet another competency hearing. The State Court reasonably relied on the most recent competence reports, which found Musaid fit to stand trial. This alone bars federal habeas relief. What's more, the evidence that Musaid was feigning incompetence is overwhelming. Finally, the State Court *did* inquire into Musaid's competence immediately before trial.

AEDPA bars federal habeas relief unless, as relevant here, the State Court "unreasonabl[y]" applied "clearly established Federal law, as determined by the

---

[1] *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

Supreme Court of the United States."[2] This "demanding" and "highly deferential" standard makes sense in light of how "[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."[3] Indeed, "[b]ecause federal habeas review overrides the States' core power to enforce criminal law, it intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority."[4]

In short, granting federal habeas relief demands that, "judged solely by the four corners" of the Supreme Court's holdings, the State Court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[5] The Supreme Court has repeatedly reminded us that "[i]f this standard is difficult to meet, that is because it was meant to be."[6]

The majority treats as precatory the Supreme Court's admonitions about AEDPA's "formidable barrier to federal habeas relief."[7] Even supposing an inquiry into Musaid's competence *were* required, the State Court did just that. In fact, it ordered fifteen competence examinations over eight years, the most recent two of which—among others—independently concluded that Musaid was competent to stand trial.

No dice, says the majority. Most of the examinations found him incompetent. But nobody disputes that a defendant who is initially found incompetent can later

---

[2] 28 U.S.C. § 2254(d)(1).

[3] *Richter*, 562 U.S. at 103, 105; *Dunn v. Madison*, 583 U.S. 10, 12 (2017).

[4] *Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) (quotation marks omitted).

[5] *Shoop v. Cunningham*, 143 S. Ct. 37, 41 (2022) (Thomas, *J.*, dissenting from denial of certiorari) (quoting *Richter*, 562 U.S. at 103).

[6] *Richter*, 562 U.S. at 102; *accord Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018); *Burt v. Titlow*, 571 U.S. 12, 20 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[7] *Titlow*, 571 U.S. at 19.

regain competence.[8] And the earlier reports finding him incompetent were conducted when Musaid was not taking his antipsychotic medication or was taking different medication. The State Court did not err in weighing the two most recent reports more than the outdated ones.

But ten months elapsed between the reports and trial, counters the majority. Perhaps Musaid stopped taking his medication and lapsed into incompetence in the interim. The State Court, explains the majority, should have conducted "a minimal inquiry" into Musaid's competence immediately before trial.[9]

This makes no sense. First, no Supreme Court case has clearly established such a requirement. Second, the two most recent reports found that Musaid was not just competent, but *remained compliant* with his medication.[10] How, then, could "no fairminded jurist" have concluded, as the State Court did, that Musaid was properly medicated and thus competent to stand trial?[11]

Third, the evidence that Musaid had been feigning incompetence was overwhelming. Multiple competence examinations attested to his propensity to

---

[8] *See, e.g.*, *United States v. Brennan*, 928 F.3d 210 (2d Cir. 2019).

[9] *Ante* at 4-5, 47-60.

[10] The record belies the majority's claim to the contrary. *See* Appendix ("A") 1213 ("Mr. Musaid reported that he has remained compliant with daily medication."); A1214 ("Mr. Musaid reported ongoing adherence to prescribed antipsychotic medication."); A1220 ("Mr. Musaid said he was taking psychotropic medications."). A comment Musaid made at trial about not receiving his medication ("Your Honor, they didn't give me my medication. I didn't take anything this morning," A314) does not convince me otherwise. The comment comes in the context of Musaid continually interjecting and attempting to disrupt the proceeding. Immediately before his medication comment, he complained that "[His] vertebrae is broken;" "[His] ribs, [his] fingers are broken;" and "There's so many lies against me." A312-14. In short, it was not unreasonable for the judge to believe that Musaid's goal was to disrupt the trial by fabricating issues—a belief supported by substantial evidence. *See* notes 12-16 and accompanying text, *post* (discussing Musaid's history of malingering).

[11] *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (quotation marks and brackets omitted).

malinger, a propensity that persisted during court proceedings. One example: In several examinations, including the most recent ones, Musaid demonstrated his understanding of the concept of "trial."[12] But at a pretrial hearing, Musaid apparently forgot, asking the judge "What is trial?"[13] This is consistent with one doctor's observation that Musaid "at times, feigned ignorance of concepts he had demonstrably mastered on previous occasions."[14] Indeed, contemporaneous exchanges between Musaid and the judge showed that Musaid understood perfectly well what a "trial" is.[15]

The record is replete with other evidence of Musaid's malingering, which would be tiresome to relate *in toto*.[16] Recognizing this, the majority claims that even if Musaid were malingering, the State Court nonetheless had to conduct another

---

[12] In the most recent examination, Musaid "demonstrated understanding of the options of proceeding to a trial versus entering into a 'negotiation' or 'plea bargain.' He reported that if the defendant takes 'the plea bargain, he gets less years. However, if he goes to the trial and they do not prove anything against him, he will get innocent and go out of the jail. But it could also be guilty and he gets more years, maybe ten, maybe more.' . . . Mr. Musaid initially expressed an unwavering preference for the trial option." A1213-14; *see also* Resp't Br. at 47 (listing instances when Musaid "had demonstrably understood basic legal concepts such as trial and the jury").

[13] A827.

[14] A1149.

[15] *See, e.g.*, A828-29 (Musaid explaining that he did not want to plead insanity at trial); A1416 ("The Court: As soon as you are better we will have the trial. The Defendant: I want to be tried." (capitalization altered)).

[16] *See, e.g.*, A1172 ("Given his presentation, [Musaid's treatment] team believed that his symptoms of 'kidney pain' or medication side effects are fabricated."); A1190-91 ("[T]here were some indications that he may be exaggerating side effects from medications, consistent with past behavior. He was later described as 'pretending' to have a dystonic reaction to medication."); A1149 ("Although Mr. Musaid . . . in formal evaluations indicated his inability to speak English, ward staff noticed that, in unguarded moments, he spoke English fluently."); A1174 (Musaid describing how he would pretend to experience severe kidney pain when he became frustrated in court); *see also* A383 (State Court recognizing Musaid to be malingering); A639 (same).

competence hearing because feigned incompetence can coexist with genuine incompetence.[17] But again, the Supreme Court has never made any such pronouncement. At bare minimum, the State Court cannot be said to have acted unreasonably in evaluating the totality of factors, *see Drope v. Missouri*, 420 U.S. 162, 180 (1975), including the plethora of evidence of malingering, to conclude that further inquiry into Musaid's competence was unnecessary.

Finally and most importantly, the State Court *did* inquire into Musaid's competence immediately before trial. When Musaid began asking questions at the pretrial conference that supposedly indicated incompetence, the Court—rather than responding to Musaid—asked Musaid's counsel if Musaid was "ready to go."[18] Musaid's counsel responded in the affirmative, which he would not have done had he thought Musaid incompetent to stand trial.[19]

The majority simply ignores the common-sense reading of "ready to go." Instead it invents a magic words requirement: unless the State Court uses the term "competent" or "fit," the inquiry doesn't count. But to ask *defense counsel* whether the defendant is "ready to go"—in response to the *defendant* asking "What is trial?"—is most plausibly read as an inquiry into the defendant's competence. It is astonishing for the majority to describe its own interpretation—that the judge's question concerned only Musaid's *preparedness* to answer questions about the insanity defense, not his *competence* to answer such questions—as the "clear reading of the exchange."[20] This overanalysis of the State Court's word choice is a reminder why Congress made AEDPA's standard so demanding: to prevent federal intrusion on "core" matters of state sovereignty.[21] All the more so when its

---

[17] *See ante* at 60 n.20.

[18] *See* text accompanying note 13; A827.

[19] *See* A827.

[20] *Ante* at 56.

[21] *Ramirez*, 596 U.S. at 376; *see Woodford v. Garceau*, 538 U.S. 202, 206 (2003) ("Congress enacted AEDPA . . . to further the principles of comity, finality, and federalism." (quotation marks

reading is "[b]ased solely on the bare language of the trial transcript, without neither detailed findings of fact nor evidence about [petitioner's] demeanor during the hearing."[22]

That last quote is from *Harris v. Kuhlmann*, 346 F.3d 330 (2d Cir. 2003), a habeas appeal concerning whether the State Court unreasonably erred in refusing to order a competence hearing, and a case the majority strains to distinguish—even though *Harris* addressed the exact question presented here.[23]

---

omitted)). The majority "bolster[s]" its conclusion by referring to "comments made by Musaid's counsel at sentencing just a few months later," when he described Musaid's competence as "an open question." *Ante* at 56 (quoting A822). Those comments—which do not even go so far as to assert Musaid's incompetence, and are just as plausibly viewed as *post hoc* sandbagging—are irrelevant to the AEDPA analysis. "It is axiomatic that in reviewing whether this obligation [to hold a competence hearing] was properly discharged only the evidence before the court at the time its decision was made is pertinent." *Nicks v. United States*, 955 F.2d 161, 168 (2d Cir. 1992).

[22] *Harris v. Kuhlmann*, 346 F.3d 330, 354 (2d Cir. 2003).

[23] Far from bolstering its position, the differences the majority identify only highlight the baffling nature of its departure from *Harris*. First, the majority notes that no examination found Harris incompetent to stand trial. *See ante* at 60. But no examination found Harris competent, either. The *Harris* Court decided not to order a competency examination at all, much less fifteen examinations—the most recent two of which, among others, found Musaid competent. As to the majority's contentions that the *Harris* Court, unlike the *Musaid* Court, "discredited" the defendant's "indicia of incompetence" and that only the *Harris* court performed a "minimal inquiry" into the defendant's competence, *ante* at 60-61, I have already explained why the majority is mistaken on both counts. *See* notes 12-16 and accompanying text (discussing Musaid's well-documented malingering, as recognized by the *Musaid* Court); notes 18-22 and accompanying text (explaining how the *Musaid* Court inquired into Musaid's competence).

Finally, the majority's assertion that Harris's counsel "failed to furnish any evidence suggesting that the defendant was incompetent," *ante* at 60, beggars belief. No evidence in the record? Harris was shot in the head three months before trial—and the bullet remained lodged in his brain. *See Harris*, 346 F.3d at 335; *id.* at 337 (quoting counsel for Harris stating, "[H]e has a bullet in his head at this moment in time. . . . [H]is ability to communicate what transpired is sorely lacking."). Harris presents at least as strong, if not a stronger, case for incompetence as

So what did we do in *Harris*? We deferred to the State Court, as AEDPA requires when the State Court's determination is not unreasonable. There was evidence for Harris's competence and for his incompetence.[24] That was enough to deny the petition. "The trial judge," we concluded, "was in a better position to assess this evidence than are we."[25] The majority's posture toward the experienced trial judge overseeing Musaid's case cannot be squared with our approach in *Harris*, much less with AEDPA.

## II.     A Conditional Writ in Name Only

Perhaps recognizing it has gone too far, the majority withholds the habeas relief Musaid seeks, instead issuing a "conditional writ" directing the State Court to consider whether to conduct a hearing on Musaid's competence "just before trial."[26]

If that sounds like an exercise in futility, that's because it is. It is folly to expect the State Court to "reconstruct," *ante* at 66, what Musaid's mental capacity would have been on the eve of trial eight years ago. The Supreme Court has found much shorter lengths of time to preclude such a retrospective determination.[27] The majority's assertion that such a remedy "is best aligned with the federalism values

---

Musaid. *See id.* at 335 ("Harris's counsel filed an affirmation in which he stated that it was impossible to communicate with Harris about the case due to the combined effects of Harris's low IQ, Harris's head injury, and the medication Harris was taking in treatment of his head wound."). If all that wasn't enough to warrant habeas relief in *Harris*, I cannot fathom how Musaid's circumstances demand a different outcome.

[24] *See Harris*, 346 F.3d at 355.

[25] *Id.*

[26] *Ante* at 63-66.

[27] *See Dusky v. United States*, 362 U.S. 402 (1960) (one year and two months); *Drope v. Missouri*, 420 U.S. 162 (1975) (six years); *Pate v. Robinson*, 383 U.S. 375 (1966) (six years). The majority gestures at "electronic systems" that could "allow for retrospective competency determinations that were impossible generations ago." *Ante* at 65. How the State Court can actually achieve this feat of anamnesis is left unexplained.

underlying our justice system," *ante* at 65, is especially rich in light of "the enormous burden" that having to retry this seventeen-year-old case that dragged on for eight years will place on the State.[28]

Make no mistake about the majority's decision. This is an unconditional writ in a conditional writ's clothing, one that will plausibly free Musaid for good. "[W]hen a habeas petitioner succeeds in obtaining a new trial, the erosion of memory and dispersion of witnesses that occur with the passage of time . . . diminish the chances of a reliable criminal adjudication."[29] Thus, when a petitioner is freed "many years after his crime, the State may be unable successfully to retry him."[30]

So the Supreme Court wrote in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), a case where sixteen years elapsed between the petitioner's crime and the Court's decision. Musaid murdered Mr. Alsamet seventeen years ago.

For the reasons set forth above, I respectfully dissent.

---

[28] *Herrera v. Collins*, 506 U.S. 390, 417 (1993).

[29] *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) (quotation marks and citation omitted).

[30] *Kuhlmann v. Wilson*, 477 U.S. 436, 453 (1986).